UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND-ODESSA DIVISION

| | | |
|---|---|---|
| EDUARDO ARMANDO GARCIA-QUIROZ, | § | |
| BOP No. 45622-080, and | § | |
| FRANCISCO RIOS-BALDERRAMA, | § | |
| BOP No. 27805-180, | § | |
| | § | |
| Movants, | § | CIVIL ACTION Nos. |
| | § | MO-06-CA-109-WRF & |
| v. | § | MO-06-CA-110-WRF |
| | § | |
| | § | CRIMINAL ACTION NO. |
| UNITED STATES OF AMERICA, | § | MO-00-CR-141(1&2) |
| | § | |
| Respondent. | § | |

## MEMORANDUM OPINION AND ORDER

Movants have each filed motions to vacate, set aside or correct their federal criminal sentences pursuant to Title 28 U.S.C. §2255. For the reasons set forth at length hereinafter, movants are entitled to have their convictions under Count Three of their Indictment vacated but movants are entitled to no other relief from this Court.

## I.  Statement of the Case

A.  Factual & Procedural Background

On September 29, 2001, a federal grand jury indicted movants and several other individuals on multiple Counts of drug trafficking and money laundering, as well as participating in a continuing criminal enterprise and conspiracies to import marijuana and to possess with intent to distribute marijuana.

The Fifth Circuit's opinion affirming movants' convictions and sentences succinctly sets forth the operative facts:

In September of 2001, the government indicted 29 individuals in connection with the illegal activities of a criminal organization known as "Los Tres de la Sierra", i.e. "The Three from the Mountains". The government charged that this organization imported large quantities of marijuana from Mexico and distributed it in the United States. Among those indicted were Balderrama and Quiroz, two of the three leaders of the organization and Chapa, one of the organization's smugglers. The indictment detailed several overt acts committed in the furtherance of the continuing criminal enterprise, including: (1) various instances of drug smuggling, and (2) the murders of Israel Pena Ocon (Ocon) and Rigoberto Loera-Carillo (Loera), allegedly ordered by Balderrama as punishment for stealing drugs and profits from the organization.

1. Balderrama and Quiroz were extradited from Australia, pursuant to the Australia-U.S. Extradition Treaty in May of 2002.

Defendants' four week trial ended in September of 2002 and resulted in guilty verdicts against Balderrama and Quiroz on the following counts: one count of engaging in a continuing criminal enterprise, in violation of 21 U.S.C. § 848 and § 846 (Count 1); one count of conspiring to possess with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a)(1) and § 846 (Count 2); one count of conspiring to import marijuana from Mexico to the United States, in violation of 21 U.S.C. § 952(a), § 960, and § 963 (Count 3); eight counts of possession with the intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Counts 5, 6, 7, 10, 12, 13, 14, & 17); one count of conspiring to commit money laundering, in violation of 18 U.S.C. § 1956(h) and 21 U.S.C. § 846 (Count 19); and four counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(I) and (2) (Counts 21, 22, 23, & 24).

*United States v. Quiroz*, 137 Fed.Appx. 667, 669, 2005 WL 1427692, 1 (5th Cir. June 20, 2005)

On January 23, 2003, the District Court sentenced each movant to serve two life sentences, as well as multiple, 480-month and 240-month, terms of imprisonment.

Both movants appealed their convictions and sentences. In an unpublished opinion issued June 20, 2005, the Fifth Circuit affirmed their convictions and sentences. *United States v. Quiroz*, 137 Fed.Appx. 667, 2005 WL 1427692 (5th Cir. June 20, 2005). The United States Supreme Court denied certiorari on January 17, 2006. *Quiroz v. United States*, 546 U.S. 1139, 126 S.Ct. 1144, 163 L.Ed.2d 1003 (2006).

B.    Post-Appellate Proceedings in this Court

On April 10, 2006, movants filed a joint motion to vacate, set aside, or correct their sentences pursuant to Title 28 U.S.C. Section 2255, together with a detailed memorandum in support thereof. *Docket entry nos. 1143 & 1144*. As grounds for relief in their *pro se* joint motion, movants argued (1) their respective trial counsel rendered ineffective assistance by (a) failing to ensure a separate interpreter was available throughout the entire trial to serve as translator for each of them, (b) contacting prosecution witness Rosie Soles and encouraging her to testify falsely, and (c) failing to adequately investigate the quantity of drugs involved in each of the drugs transactions alleged in the indictment against movants and involved in the prior convictions of each prosecution witness, (2) their appellate counsel rendered ineffective assistance on direct appeal by virtue of the fact said counsel were not fluent in Spanish, (3) the presiding trial judge coerced prosecution Rosie Soles into

testifying falsely by threatening to increase her sentence, (4) the government used perjured testimony from prosecution witnesses Rosie Soles and Ruben Carrasco-Valdez to convict movants, and (5) their convictions and dual life sentences for participating in multiple conspiracies violate the constitutional prohibition against Double Jeopardy.

On August 17, 2006, movant balderrama filed a motion for leave to amend, seeking to add several additional claims to the joint motion to vacate, to wit, claims that (1) the trial court coerced prosecution witness Rosie Soles to commit perjury and 92) the prosecution engaged in inflammatory and inappropriate jury argument. *Docket entry no. 1142.*

In an Order issued September 20, 2006, this Court granted movant Balderrama's motion for leave to amend. *Docket entry no. 1150.*

On September 20, 2006, movants filed their amended pleadings supporting their joint motion to vacate their sentences. *Docket entry nos. 1151 & 1152.* In their amended motion, movants argued (1) their trial counsel rendered ineffective assistance by (a) encouraging prosecution witness Rosie Soles to testify falsely against movants and (b) failing to direct their court-appointed investigator to investigate each prosecution witness' background to determine if any of the drug quantities involved in their particular offenses could be linked to drug conspiracies

unrelated to movants, (2) movants' appellate counsel rendered
ineffective assistance in connection with movants' motions for
new trial and direct appeals by (a) misconstruing movants'
complaints regarding the absence of interpreter Linda Foster from
critical junctures during trial (which prevented movants from
communicating with their trial counsel) and (b) failing to
preserve and present potentially meritorious points of error on
appeal, (3) the trial judge coerced prosecution witnesses Rosie
Soles and Ruben Carrasco-Valdez to furnish perjured testimony,
(4) the government knowingly employed false testimony from Soles
and Carrasco-Valdez to convict movants, (5) the prosecution
engaged in misconduct during movants' trial by coercing Soles and
Carrasco-Valdez to testify falsely against movants, and (6) the
Double Jeopardy Clause prohibits movants' convictions and dual
life sentences for conspiracy under both Sections 848 and 963 of
Title 18, United States Code, because the overt acts supporting
movants' convictions on both Counts are identical.

On November 16, 2006, the government filed its response in
opposition to movants' joint motion to vacate their sentences.
*Docket entry no. 1153.*

On December 18, 2006, movant Garcia-Quiroz filed a second
motion seeking leave to amend the joint motion to vacate to add
even more claims for relief, to wit, arguments that (1) the trial
court coerced prosecution witness Rosie Soles into testifying

falsely and (2) the prosecution made inflammatory remarks during its closing jury argument. *Docket entry no. 1158.*[1]

On February 23, 2007, movants filed a pleading in which they argued (1) prosecution witnesses Rosie Soles and Ruben Carrasco-Valdez subsequently recanted their trial testimony, (2) Balderrama's co-counsel at trial, attorney David Guinn, coerced Rosie Soles to commit perjury, (3) movants' trial counsel rendered ineffective assistance by (a) failing to inspect original arrest reports of prosecution witnesses, specifically an arrest report regarding Arturo Prieto, and (b) failing to speak adequate Spanish, (4) movants' appellate counsel rendered ineffective assistance by failing to raise points of error on direct appeal complaining about (a) the trial court's coercion of Rosie Soles to commit perjury and (b) the trial court's failure to strike prosecution witness Ruben Carrasco-Valdez's trial testimony, and (5) the government knowingly utilized perjured testimony by both Soles and Carrasco-Valdez to secure movants' convictions. *Docket entry no. 1169*.

On June 6 and June 7, 2007, movants filed their replies to the government's response to their joint motion to vacate their sentences and included even more claims, to wit, an argument that their trial and appellate counsel rendered ineffective assistance

---

[1] These claims are identical to those already included in movants' first amended motion to vacate.

by failing to move to strike Count Three of the indictment against them on Double Jeopardy grounds. *Docket entry nos. 1182 & 1183.*

## II. <u>Ineffective Assistance Claims</u>

A.    <u>The Constitutional Standard</u>

The constitutional standard for determining whether a criminal defendant has been denied the effective assistance of *trial* counsel, as guaranteed by the Sixth Amendment, was announced by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

To satisfy the first prong of *Strickland*, i.e., establish that his counsel's performance was constitutionally deficient, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003); *Williams v. Taylor*, 529 U.S. 362, 390-91, 120 S.Ct. 1495, 1511, 146 L.Ed.2d 389 (2000). In so doing, a convicted defendant must

carry the burden of proof and overcome a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance. *Strickland v. Washington*, 466 U.S. at 687-91, 104 S.Ct. at 2064-66. Courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight. *See Wiggins v. Smith*, 539 U.S. at 523, 123 S.Ct. at 2536 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms which includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time). It is strongly presumed counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland v. Washington*, 466 U.S. at 690, 104 S.Ct. at 2066.

To satisfy the "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542; *Strickland v. Washington*, 466 U.S. at 694, 104 S.Ct. at 2068. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Id.* In evaluating prejudice, a federal habeas

court must re-weigh the evidence in aggravation against the totality of available mitigating evidence. *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542.

In evaluating movants' complaints about the performance of their trial and appellate counsel, the issue before this Court is whether the movants' fact-specific allegations satisfy both prongs of the *Strickland* analysis. *Schaetzle v. Cockrell*, 343 F.3d 440, 444 (5th Cir. 2003), *cert. denied*, 540 U.S. 1154 (2004). A convicted criminal defendant urging an ineffective assistance claim has the burden to prove both prongs of the *Strickland* ineffective assistance standard by a preponderance of the evidence. *Montoya v. Johnson*, 226 F.3d 399, 408 (5th Cir. 2000), *cert. denied*, 522 U.S. 1067 (2001).

Under the well-settled *Strickland* standard, the Supreme Court recognizes a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Bell v. Cone*, 535 U.S. at 698, 122 S.Ct. at 1852; *Strickland v. Washington*, 466 U.S. at 690, 104 S.Ct. at 2066; *Scheanette v. Quarterman*, 482 F.3d 815, 820 (5th Cir. 2007); *Sonnier v. Quarterman*, 476 F.3d 349, 356 (5th Cir. 2007), *cert.* denied, ___ U.S. ___, 128 S.Ct. 374, 169 L.Ed.2d 259 (2007); *Amador v. Quarterman*, 458 F.3d 397, 410 (5th Cir. 2006), *cert. denied*, 550 U.S. 920 (2007); *Gonzales*

*v. Quarterman*, 458 F.3d 384, 390 (5th Cir. 2006), *cert. denied*,

549 U.S. 1323 (2007).

B.    Complaints About Trial Counsel

    1.    The Absence of Movants' Interpreter

    Movants argue they were deprived of the assistance of an

interpreter during critical phases of their trial.  More

specifically, they argue the absence of an interpreter prevented

them from communicating effectively with their counsel during the

cross-examination of several key prosecution witnesses.  In his

affidavit in support of movants' ineffective assistance claim,

however, movant Balderrama furnishes only the vaguest allegations

imaginable:

> During trial I was having trouble communicating with
> counsel and understanding all the proceedings due to my
> lack of English understanding and counsel's limited
> Spanish understanding.  My co-defendant, Armando Quiroz
> [sic], had an appointed court interpreter sit next to
> him whom I would take advantage to help me translate.
> The problem was that she repeatedly would leave and
> attend other matters which included being out of the
> courtroom and courthouse.  Frustrated by her prolonged
> absence, counsel's limited Spanish understanding and
> communication between client and counsel, I asked
> counsel to request Linda foster to stay and if needed
> to hire her so that she could be present throughout the
> whole proceedings.  Obviously I was making counsel
> aware of my need for an interpreter and counsel should
> have apprized the court of my request or the very least
> advise me that I could utilize the service of another
> interpreter.  If there were other interpreters in the
> courtroom, I was never advised or made aware that they
> were their [sic] for my benefit.

*Docket entry no. 1182.*

In stark contrast to the inaccurate picture painted by
movant Balderrama, throughout the course of movants' trial, they
had the assistance of interpreters who made real time
translations of all court proceedings.  This Court also furnished
movants with an additional, separate, interpreter, Linda Foster,
who sat between movants to assist them with any communications
they wished to make with their counsel during trial.  This was
done despite the fact that movants' trial counsel were extremely
proficient, albeit not fluent, in Spanish.  Due to her other
responsibilities, Mr. Foster was compelled to be absent for brief
periods of movants' trial.  At no time did either movant voice
any complaint to their trial counsel or to this Court over Ms.
Foster's brief absences.

During the course of movant Balderrama's direct appeal, he
presented a complaint regarding Ms. Foster's absence during
unspecified portions of the trial.  The Fifth Circuit concluded
its analysis of that complaint as follows:

> The record demonstrates that, in addition to a lawyer
> who spoke some degree of Spanish, an interpreter was
> assigned to sit between, and assist, Balderrama and
> Quiroz during the trial. While Balderrama argues that
> having to share an interpreter with Quiroz inhibited
> the openness of his communication with his attorney,
> given the nature of the joint defense Defendants
> coordinated, the district court provided Balderrama
> with a sufficient interpreter under the Court
> Interpreter's Act, 28 U.S.C. § 1827(d)(1) and this
> Court's holding in *U.S. v. Tapia*, 631 F.2d 1207 (5th
> Cir.1980). Also, Balderrama's claim fails for the
> additional reason that he demonstrates no prejudice
> which resulted from the lack of an interpreter assigned

solely to him.

*United States v. Quiroz*, 137 Fed.Appx. 667, 672, 2005 WL 1427692, 4 (5th Cir. June 20, 2005).

On April 5, 2007, in response to movants' conclusory assertions they were denied the ability to communicate with their trial counsel, David Quinn, one of movant Balderrama's trial counsel, furnished the Court with an affidavit in which he stated, in pertinent part, that (1) Mr. Balderrama always had use of the certified interpreter by the radio headset, (2) there were always two, if not three, interpreters in the courtroom, (3) at no time did Mr. Balderrama complain of an inability to either understand the proceedings or to communicate with counsel, (4) on only two occasions did I have to ask Ms. Foster to help translate what Mr. Balderrama was saying over my shoulder, and (5) at no time did her absence cause a problem in communication. *Affidavit of David M. Guinn, Jr., at pp. 2-3, Docket entry no. 1179.*

In the face of these averments and appellate court conclusions, movants furnish only very sketchy information in support of their complaint. At no point in their lengthy pleadings do movants identify any particular prosecution witness whose cross-examination they claim was detrimentally impacted by virtue of Ms. Foster's absence from the courtroom. Likewise, movants do not identify with specificity any areas of inquiry, much less any specific questions, they claim their trial counsel

12

could or should have explored during cross-examination of these
ill-defined witnesses.  Nor does either movant claim to have
unsuccessfully attempted to communicate, or wished to
communicate, any specific information to their trial counsel
during any of Ms. Foster's absences from the courtroom.  Movant
Garcia-Quiroz's co-counsel at trial (attorney Rick Strange) has
furnished an affidavit in which he states, in pertinent part, as
follows:

> I recall that Mrs. Foster had conflicts that she was
> unable to resolve, but I do not recall her being absent
> for an extended period of time.  When she was
> unavailable, I do not recall any situation in which Mr.
> Carney and I were unable to communicate with our
> client.  Mr. carney speals some Spanish, Mr. Guinn was
> able to communicate with Mr. balderrama and Mr. garcia-
> Quiroz, and we had access to the interpreter sitting
> with the witnesses.  We visited with our client
> continuously during the course of the trial.  I do not
> recall any instance in which Mr. Carney or myself were
> forced to cross-examine a witness without the benefit
> of our client's input.

*Affidavit of Rick Strange, Docket entry no. 1153.*

"[C]onclusory allegations are insufficient to raise
cognizable claims of ineffective assistance of counsel." *United
States v. Demik*, 489 F.3d 644, 646 (5th Cir. 2007), *cert. denied*,
___ U.S. ___, 128 S.Ct. 456, 169 L.Ed.2d 319 (2007).  "Mere
conclusory allegations in support of a claim of ineffective
assistance of counsel are insufficient to raise a constitutional

issue." *United States v. Holmes*, 406 F.3d 337, 361 (5th Cir. 2005), *cert. denied*, 546 U.S. 871 (2005).

Movants do complain, in a highly conclusory fashion, that, has their trial counsel done a better job cross-examining prosecution witnesses, at least some portions of the marijuana seized during numerous unsuccessful attempts to smuggle same into the United States from Mexico might have been shown to have been attributable to drug conspiracies unrelated to their own. Movants argue, again with no specific factual support, that a more thorough cross-examination of prosecution witnesses might have reduced the quantity of drugs attributable to their smuggling operation. However, movants furnish no discernable, identifiable, specific facts to substantiate this wholly conclusory assertion. Thus, movants have failed to allege specific facts showing the failure of their trial counsel to more meticulously cross-examine any prosecution witness was objectively unreasonable. Movants' trial counsel, along with trial counsel for their co-defendants, scrupulously cross-examined virtually all prosecution witnesses who gave any testimony linking either movant to any quantity of marijuana discovered or seized by law enforcement officials. Likewise, movants' trial counsel carefully cross-examined each of the prosecution witnesses who testified regarding their participation in, or dealings with, movants' long-term, large-scale, marijuana-

14

smuggling operation. Movants' naked assertion that their trial counsel could have done a better job cross-examining prosecution witnesses regarding drug quantities, bereft of any factual specificity, is precisely the type of conclusory assertion which fails to raise a cognizable claim of ineffective assistance. *United States v. Demik*, 489 F.3d at 646; *United States v. Holmes*, 406 F.3d at 361.

Movants were convicted and sentenced to dual life sentences based primarily upon their participation, as leaders, in a large-scale, long-term, marijuana-smuggling operation which operated for more than half a decade and was responsible for transporting into the United States far more than the 30,000 kilograms of marijuana charged in the indictment against them.[2] Moreover, the

---

[2] The largely uncontroverted testimony at movants' trial established that movants' marijuana-smuggling organization operated from the mid-1990's until their arrest in Australia in September, 2000. Prosecution witness Omar Urias Carrillo testified, in pertinent part, that (1) he was responsible for supervising the loading of marijuana and crossing loads into the united states for movants for several years, (2) during 1997 alone, more than twenty loads, averaging in excess of one thousand pounds each, made it through to their ultimate destination of the Fort Worth-Arlington, Texas area, (3) during 1998, four-to five loads of approximately 1,500 pounds each went through, as did another five-to-six loads of approximately seven-to-eight hundred pounds each, and (4) another twenty loads in excess of one thousand pounds each were successfully crossed during 1999. S.F. Trial, Volume 1, testimony of Omar Urias Carrillo, at pp. 129-210.

Arturo Prieto Moreno testified he (1) received large shipments of marijuana from movants every two weeks or so, (2) was able to secure at least 1,500 pounds of marijuana from movants every two weeks or so beginning in the mid-1990's and continuing for many years, and (3) helped to distribute

undisputed testimony at movants' trial established beyond any

reasonable doubt that movants were directly responsible for the

murders of at least three individuals whom movants perceived as

having interfered with movants' marijuana-smuggling operation.[3]

---

approximately five million dollars worth of marijuana for
movants' organization. S.F. Trial, Volume 3, testimony of Arturo
Prieto Moreno, at pp. 692-700; Volume 4, testimony of Arturo
Prieto Moreno, at pp. 705-15, 793.
    George Olivas Contreras testified extensively about the
large quantities of marijuana (often in loads in excess of one
thousand pounds) which he personally transported for movants
beginning in 1997 and continuing up through his arrest in
October, 1999. S.F. Trial, Volume 4, testimony of George Olivas
Contreras, at pp. 817-79.
    Dallas drug dealer Jeffery Keith Hebert testified his
organization received and distributed approximately twelve-to-
twenty thousand pounds of marijuana from movants' organization
during the approximately one and a half years the two
organization did business with each other from 1998 to May, 1999.
S.F. Trial, Volume 6, testimony of Jeffery Keith Hebert, at pp.
1278-96.

    [3] A pair of drug-dealers from the Dallas-Forth Worth area
with whom movants dealt during the late-1990's testified that,
during a visit to Mexico, movants explained to them in detail how
they, together with Gracielo Gardea arranged the murder of an
individual (Rigoberto Loera) whom movants felt was responsible
for the loss of one of their marijuana shipments across the
border. S.F. Trial, Volume 6, testimony of Jeffery Keith Hebert,
at pp. 1319-27; S.F. Trial, Volume 7, testimony of Walter Ray
Mitchell, at pp. 1391-94, 1407.  Another member of movants'
smuggling operation testified about a conversation he had with
movant Balderrama, in which Balderrama explained how he had
ordered the murder of a different individual (Shorty Ocon) whom
Balderrama believed had stolen a load of marijuana from him. S.F.
Trial, Volume 6, testimony of Jose Padilla, at pp. 1255-56.
Movants also explained to yet another member of their drug
conspiracy how (1) movant Quiroz and another individual
identified as "El Choppo" murdered Rigoberto Loera at Gracielo
Gardea's home and then transported the bodies of Loera and a com-
panion of Loera's whom they also murdered back across to the
American side of the border and (2) movant Balderrama drove El
Choppo to Shorty Ocon's home and El Choppo murdered Ocon. S.F.

Movants' conclusory complaints about the absence of Ms.
Foster from the courtroom for brief intervals during their trial,
unadorned by any specific facts showing how they were prejudiced
by her brief absences, do not satisfy either prong of the
*Strickland* test.

2. <u>Failure to Investigate Prosecution Witnesses & Drug
Quantities or Adequately Cross-Examine Witnesses</u>

Movants' generic complaints that their trial counsel failed
to (1) adequately investigate (a) the backgrounds of unspecified
prosecution witnesses, and more specifically the quantities of
drugs involved in those witnesses' prior criminal offenses, and
(b) the quantities of drugs involved in each of the overt acts
alleged in the indictment against movants and (2) review arrest
reports of prosecution witnesses, all suffer from the same
vagueness defects as their first assertion of ineffective
assistance. *See Anderson v. Collins*, 18 F.3d 1208, 1221 (5th Cir.

---

Trial, Volume 11, testimony of Rito Mendoza, at pp. 2228-36.  Yet
another drug dealer from the Fort Worth area testified that (1)
he dealt with Balderrama's organization for many years beginning
in the 1995-96 time frame, (2) at one point, Balderrama informed
him via a telephone call that a shipment of Balderrama's
marijuana had been stolen by a person named Shorty Ocon, (3)
Balderrama later informed him that he (Balderrama) had ordered
Ocon's murder, and (4) Balderrama also claimed to have shot a
former sheriff named Rigoberto Loera in the head. S.F. Trial,
Volume 4, testimony of Arturo Prieto-Moreno, at pp. 753-55, 759.
Yet another drug distributer who did business with movants
testified movants told him how they had sent "El Choppo" to kill
Shorty Ocon and then later used Gracielo Gardea to lure Rigoberto
Loera into Mexico, where Loera was also fatally shot. S.F. Trial,
Volume 11, testimony of Rito Mendoza, at pp. 2228-35, 2270-71.

1994)(holding absent a specific, affirmative showing of precisely
what evidence or testimony was rendered unavailable due to a
trial counsel's failure to investigate, develop, and present
same, i.e., a showing of exactly what the missing evidence or
testimony would have been, a court cannot even begin to apply the
*Strickland* analysis because it is very difficult to determine
whether the defendant was prejudiced by any such deficiencies in
counsel's performance).  Movant has failed to identify with
specificity exactly what beneficial information their trial
counsel could have discovered had said counsel undertaken, at the
time of movants' trial, a more thorough investigation into the
drug quantities involved in either the overt acts alleged against
movants or involved in any prior drug convictions of any
identified prosecution witness.  Movants' generic complaint fails
to satisfy the prejudice prong of *Strickland.*

In one of their many unverified pleadings submitted long
after the Government filed its response to movants' amended
motion to vacate, movants for the first time offered a degree of
specificity, albeit extremely little, in support of their
complaint that their trial counsel should have done a better job
investigating the backgrounds of prosecution witnesses.  More
specifically, movants identified a single DEA report which they
claim showed that, at the time of his arrest on or about October
31, 1998, Arturo Prieto-Moreno, a prosecution witness, stated

that the marijuana he possessed at the time of his arrest had
been obtained from Carlos Perez and not from the movants'
organization. *Docket entry no. 1169, at p. 14.* Unfortunately for
movants, revelation of this information would have had little
impact upon the gist of Prieto-Moreno's trial testimony, which
established that (1) beginning in the 1995-96 time frame, Prieto-
Moreno negotiated with movant Balderrama to purchase large
quantities of marijuana from Balderrama, (2) while the initial
loads Balderrama delivered to Prieto-Moreno in the Fort Worth
area were relatively small, i.e., 300 to 700 pounds, shortly
after they began doing business, the size of the shipments
Prieto-Moreno received from Balderrama's organization increased,
(3) eventually, Prieto-Moreno was receiving marijuana shipments
of up to 2,500 pounds from Balderrama's organization every two
weeks, and (4) Prieto-Moreno continued doing business with
Balderrama's organization on this scale for several years, until
Prieto-Moreno's arrest. S.F. Trial, Volume 3, testimony of Arturo
Prieto-Moreno, at pp. 690-700; Volume 4, testimony of Arturo
Prieto-Moreno, at pp. 705-17. The fact that Prieto-Moreno was
arrested in late 1998 while in possession of a quantity of
marijuana he had acquired from a source other than Balderrama's
organization has no relevance to Prieto-Moreno's testimony
concerning his dealings with Balderrama's organization for many
years prior to Prieto-Moreno]s arrest. This information could

not have been used to impeach Prieto-Moreno because, at no point did Prieto-Moreno claim that Balderrama's organization was his *exclusive* source for marijuana.

Movants fail to identify precisely what helpful information would have been discovered had their trial counsel engaged in further investigation of specific prosecution witnesses' backgrounds. Likewise, movants have failed to identify facts which show their trial counsel had any reason to suspect, at the time of movants' trial, that further investigation into the background of any particular prosecution witness might yield helpful information, i.e., either exculpatory or mitigating evidence or evidence which could have been used to impeach that witness' testimony on direct. Under these circumstances, movants have also failed to show their trial counsels' failure to more thoroughly investigate the background of any identified prosecution witness was objectively unreasonable. *See Smith v. Collins*, 977 F.2d 951, 960 (5th Cir. 1992)("The defense of a criminal case is not an undertaking in which everything not prohibited is required. Nor does it contemplate the employment of wholly unlimited time and resources."), *cert. denied*, 510 U.S. 829 (1993).

Movant Garcia-Quiroz's co-counsel at trial (attorney Rick Strange) states in his affidavit as follows:

Mr. Carney and I filed comprehensive pre-trial motions, reviewed the voluminous material provided by the government in response to our requests, and spent considerable time organizing that information in a useable format.  My recollection is that we had a copy of relevant criminal records and the plea bargain of every witness.  We utilized this information to perform the impeachment suggested by the [movants'] memorandum of law.

*Docket entry no. 1153.*

Movant Balderrama did furnish an affidavit in support of movants' ineffective assistance claims. *Docket entry no. 1182.* However, instead of supporting the assertions of ineffective assistance contained in movants' amended Section 2255 motion, Balderrama's affidavit consists of a host of additional, conclusory, assertions of ineffective assistance.  For instance, Balderrama alleges that his trial counsel failed to utilize documents which Balderrama claims to have given to said counsel to impeach prosecution witnesses Ruben Carrasco-Valdez and Jeffery Keith Hebert on wholly ancillary issues such as (1) whether any of Balderrama's legitimate business operations predated Balderrama's participation in the drug conspiracy and (2) Hebert's descriptions of the murder of Rigoberto Loera.  For a plethora of reasons, these additional allegations suffer from the same defects as petitioner's other ineffective assistance claims.  First, movants did not furnish this Court with copies of any of the documents in question nor explain precisely how those clearly hearsay documents could have been utilized to impeach either Carassco-Valdez or Hebert.  Second, the question of which

21

came first, Balderrama's legitimate business interests or the drug conspiracy, was immaterial to the issues before the jury. Carrasco-Valdez hemmed and hawed over virtually every answer he gave during his examination.  Balderrama's central role as leader of the drug conspiracy did not depend in any respect on the timing of Balderrama's entry into the drug conspiracy.

Third, movants disregard the fact that Hebert never claimed to have any personal knowledge regarding the murder of Loera and Loera's companion Gerardo Pando.  Rather, Hebert simply recited to the jury the inculpatory statements about Loera's murder made by movants to Hebert during a trip by Hebert to Mexico.  The jury could reasonably have concluded that if there was anything factually inaccurate in the information Hebert related to the jury regarding Loera's murder, movants were responsible for those errors, not Hebert.  Moreover, insofar as movants complain their counsel failed to use autopsy and police reports to cross-examine Hebert, movants do not suggest how such *hearsay* documents could have been so utilized.  Movants do not allege that any statements made by Hebert were recorded in those documents.  Nor do movants offer any rational explanation as to how those documents could have been used to impeach testimony from Hebert which did little more than recount what movants had told Hebert about the murders in question.

Likewise, Balderrama complains in his affidavit that his trial counsel failed to utilize hearsay information regarding Gracielo Gardea contained in unspecified BOP/INS reports. However, movants have not furnished this Court with copies of any of those documents nor explained precisely how such hearsay documents could have been utilized to impeach any identified prosecution witness. Balderrama claims that these documents would have shown Gracielo Gardea was incarcerated at the time of the murder of Shorty Ocon, thus impeaching trial testimony by prosecution witnesses suggesting Gardea was involved in Ocon's murder. *In reality, there was no testimony given during movants' trial suggesting Gracielo Gardea was personally involved in Shorty Ocon's 1997 murder.* For instance, both movants told one of their drug distributers they sent the shootiest "El Choppo" to kill Shorty Ocon at Ocon's residence. S.F. Trial, Volume 11, testimony of Rito Mendoza, at pp. 2228-29. In contrast, several prosecution witnesses testified that Gardea and movants told them precisely how Gardea was involved in the 1998 murder of Rigoberto Loera; more specifically, Gardea and movants explained to various individuals with whom they did business that Gardea had made the telephone call which lured Loera to Gardea's residence, the very location where Gardea and movants claimed Loera and an innocent companion of Loera named Gerardo Pando were gunned down in cold blood. S.F. Trial, Volume 6, testimony of Jose Padilla, at pp.

1255; Volume 6, testimony of Jeffery Keith Hebert, at pp. 1319-27, 1360; Volume 7, testimony of Walter Ray Mitchell, at pp. 1392-94, 1407; Volume 11, testimony of Rito Mendoza, at pp. 2230-35. Thus, evidence showing Gracielo Gardea was incarcerated at the time of Ocon's murder would have been irrelevant and immaterial to any issue at movants' trial.

Thus, movants' complaints regarding their trial counsels' alleged failure to adequately investigate the backgrounds of prosecution witnesses and the quantities of drugs involved in the overt acts alleged against movants and said counsels' alleged failure to adequately cross-examine prosecution witnesses all fail to satisfy either prong of *Strickland.*

### 3. Encouraging Rosie Soles to Testify Falsely

Movants complain that their trial counsel contacted prosecution witness Rosie Soles and encouraged her to testify falsely at trial against movants. As even a cursory review of the record from movants' trial demonstrates, this outrageous complaint against their trial counsel has no basis in reality.

On September 4, 2002, after the mid-point of trial, this Court held a hearing outside the presence of the jury to discuss with the parties and their counsel the fact prosecution witness Rosie Soles had indicated to the prosecution that she did not wish to testify against movants, in contravention of the

representations she had made to the government and this Court in her prior plea agreement. S.F. Trial, Volume 8, Hearing held September 4, 2002, at pp. 1779-90. During that hearing (1) this Court admonished Mrs. Soles that she could lose the benefits of her plea agreement, specifically, the cap on her potential sentence included in her plea agreement, should she refuse to testify in contravention of the terms of her plea agreement, (2) despite this court's admonitions, Mrs. Soles persisted in asserting that she did not wish to testify, but (3) when movant Balderrama's counsel (attorney Daniel Hurley) stood up and explained in open court that he had consulted with movant Balderrama and that Mrs. Soles had movant Balderrama's "blessing" to go ahead and tell the truth, Mrs. Soles then changed her mind and indicated she would testify truthfully when called upon to do so. *Id.*, at pp. 1783-84. At no point during that hearing or at any point thereafter (until the filing of movants' post-conviction motions) did movant Balderrama protest or complain that his trial counsel had misrepresented his feelings or wishes on this subject.

Mrs. Soles' subsequent trial testimony established, in pertinent part, that (1) she and movant Balderrama engaged in an extra-marital affair during the course of their drug conspiracy, (2) she began laundering money for her ex-husband (Arturo Prieto), a participant in movants' drug conspiracy, in 1997 and

continued to do so until May, 1998, (3) she was summoned to
Mexico by movant Balderrama to discuss marijuana smuggling and
met with him there in December, 1999, (4) during their
discussions, she suggested that, if movant Balderrama could find
a way to get marijuana across the border, she could arrange to
transport it to the Dallas-Fort Worth Metroplex for distribution
by movants' organization, (5) she agreed to pay movants
approximately $325 to $350 per pound of marijuana, which they
planned to sell in Dallas for $375 to $400 per pound, (6) she
subsequently purchased two cattle haulers and arranged to have
false compartments for concealing drugs built into them, (7) the
first load of movants' marijuana to come across on her cattle
haulers went out around Valentine's day, 2000, (8) thereafter,
one load went out approximately every two weeks until August,
2000, (9) the first load totaled approximately 2,800 pounds, and
(10) when movants were arrested in Australia, she traveled there
to assist them with their legal problems and to assist their
plans to escape from custody. S.F. Trial, Volume 9, testimony of
Rosie Soles, at pp. 1928-90.

In his affidavit responding to movants' assertions of
ineffective assistance, movant Balderrama's other co-counsel at
trial (attorney David Guinn) states "Mr. Balderrama was
abundantly clear in communicating that he gave his 'blessing' to
Rosie Soles testifying against him.  He wanted to show the court

26

that, contrary to the United States' assertions, he was not
trying to intimidate any witnesses from testifying against him."
*Docket entry no. 1179.* Movant Garcia-Quiroz's trial counsel
(attorney Rick Strange) has furnished an affidavit in which he
categorically denies he ever did anything to encourage Rosie
Soles to testify against movant Garcia-Quiroz. *Docket entry no.
1153.* In contrast, movants have offered this Court no fact-
specific allegations, much less a controverting affidavit,
suggesting that movant Balderrama's trial counsel misrepresented
movant Balderrama's wishes when said counsel made the
representations in question in open court.[4] Nor have movants
furnished this Court with an affidavit, or any fact-specific
allegations, establish movant Garcia-Quiroz's trial counsel ever
did or said anything to encourage Rosie Soles to testify against
his client at trial. Likewise, movants have furnished this Court
with no fact-specific allegations establishing that their trial
counsel had any contact with prosecution witness Rosie Soles
other than that which occurred during the hearing held outside
the jury's presence on September 4, 2002 or during their

---

[4] While movant Balderrama did furnish the Court with an
affidavit dated May 24, 2007, his affidavit is completely silent
with regard to the circumstances surrounding his trial counsel's
assertions in open that Balderrama had given his "blessing" to
Rosie Soles' trial testimony. *Docket entry no. 1182.*
Significantly, movant Balderrama does not allege any facts in
this affidavit which contradict the statements made in open court
by his trial counsel or which suggest said counsel's statements
were less than fully accurate.

27

extensive cross-examination of Mrs. Soles in open court the following day.  At no time have movants furnished any fact-specific allegations showing that their trial counsel ever suggested to Mrs. Soles that she testify in anything other than a completely forthright and truthful manner.  Finally, movants have not identified with specificity any testimony given by Mrs. Soles during their trial which they claim was factually inaccurate.

Movants' conclusory, assertions that their trial counsel encouraged prosecution witness Rosie Soles to testify falsely at trial do not satisfy either prong of the *Strickland* test.

### 4.  Failing to Raise Double Jeopardy Claim on Count Three

Movants argue their trial counsel should have urged the dismissal of Count Three (the alleged violation of 21 U.S.C. §963, i.e., the conspiracy to import marijuana charge) based on the same arguments applicable to Count Two, i.e., that the conspiracy to import marijuana charge alleged against them was a lesser-included offense of their continuing criminal enterprise offense. *Plaintiffs' [sic] Response to Government's Response to Plaintiffs' [sic] Motion to Vacate, set Aside or Correct Sentence, filed June 6, 2007, docket entry no. 1182, at pp. 2-4.*

Movants argue their trial counsels' failure to move to dismiss Count Three of the indictment against them on Double Jeopardy grounds constituted ineffective assistance because that

Count relies on the same overt criminal conduct as Count One. Count One of the Indictment against movants charged them with a violation of 21 U.S.C. §848, i.e., engaging in a continuing criminal enterprise (more specifically, serving as the principal administrators, organizers, and leaders of more than five persons participating in concert who derived substantial resources or income from a continuing series of controlled substance offenses, in movants' case conspiracies to possess and possess with intent to distribute more than 30,000 kilograms of marijuana and to import more than 30,000 kilograms of marijuana).  Count Two charged movants with conspiring to possess with intent to distribute more than 1,000 kilograms of marijuana in violation of 21 U.S.C. §846.  Count Three charged movants with conspiring to import more than 1,000 kilograms of marijuana, in violation of 21 U.S.C. §963.

The jury returned guilty verdicts on Counts One, Two, and Three of the indictment against both movants. S.F. Trial, Volume 16, at pp,. 2909-11.  The government subsequently dismissed Count Two against both movants, based on the United States Supreme Court's holding in *Rutledge v. United States*, 517 U.S. 292, 116 S.Ct. 1241, 134 l.Ed.2d 419 (1996), which held, in part, that conspiracy to distribute a controlled substance (as defined in 21 U.S.C. §846) is a lesser-included offense of the continuing criminal enterprise offense defined in Section 848 of Title 21,

United States Code. S.F. Trial, Sentencing Proceeding January 23, 2003, at p. 69. Movants correctly point out that their trial counsel failed to object to movants' sentencing on Count Three (conspiracy to import in violation of 21 U.S.C. §963) and failed to urge the trial court to require the Government to choose between having movants sentenced on Counts One and Three.

It is well settled that a drug conspiracy charge under Section 846 of Title 21, United States Code, is a lesser-included the offense of a criminal enterprise charge defined by Section 848 of Title 21, United States Code. *See Rutledge v. United States*, 517 U.S. at 300, 116 S.Ct. at 1247 ("Because § 846 does not require proof of any fact that is not also a part of the CCE offense, a straightforward application of the *Blockburger* test leads to the conclusion that conspiracy as defined in § 846 does not define a different offense from the CCE offense defined in § 848."); *United States v. Bass*, 310 F.3d 321, 330 (5th Cir. 2002)(recognizing conspiracy is a lesser-included offense of a CCE conviction); *United States v. Narvaiz-Guerra*, 148 F.3d 530, 534 (5th Cir. 1998)(recognizing the same), *cert. denied*, 525 U.S. 1046 (1998). Sections 963 and 846 are identical conspiracy provisions found in successive sub-chapters of the same chapter of Title 21, United States Code. Section 848's CCE provisions make it a criminal offense for individuals to serve in a leadership or administrative role in concert with five or more

other persons to engage in a continuing series of felonies outlawed by those same two sub-chapters. There is no logical reason why the Supreme Court's holding in *Rutledge* should be limited to conspiracies outlawed by Section 846 but not those outlawed by Section 963.

> Conspiracy is considered a lesser-included offense of a CCE, and a court may not impose punishment for both offenses without violating the Double Jeopardy Clause. *Rutledge v. United States,* 517 U.S. 292, 300, 116 S.Ct. 1241, 1247, 134 L.Ed.2d 419 (1996). This is not to say, however, that the Double Jeopardy Clause prohibits a *trial* on both conspiracy and CCE charges; it merely precludes the imposition of cumulative punishments. *See id.* at 307, 116 S.Ct. 1241 (holding that, where the defendant was convicted of both a CCE and a conspiracy to distribute controlled substances that was coextensive in time and conduct to the CCE, one of the convictions had to be vacated because Congress did not intend for cumulative punishments).

*United States v. Ziskin*, 360 F.3d 934, 948-49 (9th Cir. 2003).

It is obvious that movants' convictions under both Counts Two and Three should have been dismissed once the government chose to request sentencing under Count One, i.e., the continuing criminal enterprise charge. In view of the clear holding in *Rutledge*, which was readily available to movants' trial counsel at the time of movants' sentencing hearing, the failure of movants' trial counsel to request dismissal of Count Three was objectively unreasonable and professionally deficient. Thus, movants have satisfied the first prong of *Strickland*.

31

Each movant received a life sentence based upon the jury's guilty verdict on Count One. This fact does not lessen the prejudice movants sustained as a result of the concurrent life sentences they received under Count Three. The Supreme Court has clearly stated that even concurrent sentences can comprise multiple punishments which violate the Double Jeopardy Clause:

> The second conviction, whose concomitant sentence is served concurrently, does not evaporate simply because of the concurrence of the sentence. The separate *conviction,* apart from the concurrent sentence, has potential adverse collateral consequences that may not be ignored. For example, the presence of two convictions on the record may delay the defendant's eligibility for parole or result in an increased sentence under a recidivist statute for a future offense. Moreover, the second conviction may be used to impeach the defendant's credibility and certainly carries the societal stigma accompanying any criminal conviction.

*Ball v. United States,* 470 U.S. 856, 864-65, 105 S.Ct. 1668, 1673, 84 L.Ed.2d 740 (1985).

Each movant was also assessed a special assessment based upon his conviction on Count Three. Thus, the failure of movants' trial counsel to object to movants' sentencing on Count Three or otherwise to move to dismiss Count Three once the government sought to have movants sentenced on Count One, i.e., the CCE Count, "prejudiced" movants within the meaning of *Strickland.*

Movants are entitled to have their convictions and sentences under Count Three vacated, including the appropriate reduction in the total of their special assessments.

C.    Complaints About the Performance of Appellate Counsel

     Movants complain their appellate counsel rendered
ineffective assistance in connection with movants' motions for
new trial and direct appeals by (1) misconstruing movants'
complaints regarding the absence of interpreter Linda Foster from
critical junctures during trial (which prevented movants from
communicating with their trial counsel) and (2) failing to
preserve and present potentially meritorious points of error on
appeal, specifically complaints regarding the trial court's
coercion of prosecution witnesses Ruben Carrasco-Valdez and Rosie
Soles and the prosecution's knowing use of perjured testimony by
these same two witnesses to secure movants' convictions.
*Petitioner's [sic] Reply Response to Government's Response*, *filed
February 23, 2007, docket entry no, 1169, at pp. 2-25.*

     1.    The Same Constitutional Standard Applies

     The same two-pronged standard for evaluating ineffective
assistance claims against trial counsel announced in *Strickland*
applies to complaints about the performance of counsel on appeal.
*See Smith v. Robbins*, 528 U.S. 259, 285, 120 S.Ct. 746, 764, 145
L.Ed.2d 756 (2000)(holding a petitioner arguing ineffective
assistance by his appellate counsel must establish both (1) his
appellate counsel's performance was objectively unreasonable and
(2) there is a reasonable probability that, but for appellate
counsel's objectively unreasonable conduct, the petitioner would

have prevailed on appeal); *Henderson v. Quarterman*, 460 F.3d 654, 665 (5th Cir. 2006)(holding *Strickland* furnishes the proper standard for review of a complaint of ineffective assistance by state appellate counsel), *cert. denied*, 549 U.S. 1252 (2007); *Amador v. Quarterman*, 458 F.3d at 410-11 (holding complaints of ineffective assistance by state appellate counsel are governed by the *Strickland* standard of review); *Moreno v. Dretke*, 450 F.3d 158, 168 (5th Cir. 2006)(applying the dual prongs of *Strickland* analysis to complaints of ineffective assistance by appellate counsel), *cert. denied*, 549 U.S. 1120 (2007); *Busby v. Dretke*, 359 F.3d 708, 714 (5th Cir. 2004)(holding *Strickland* applies to a prisoner's claim his appellate counsel was ineffective for failing to raise a certain issue on appeal), *cert. denied*, 541 U.S. 1087 (2004).

Thus, the standard for evaluating the performance of counsel on appeal requires inquiry into (1) whether appellate counsel's performance was deficient, i.e., whether appellate counsel's conduct was objectively unreasonable under then-current legal standards, and (2) whether appellate counsel's allegedly deficient performance "prejudiced" petitioner, i.e., whether there is a reasonable probability that, but for appellate counsel's deficient performance, the outcome of petitioner's appeal would have been different. *Smith v. Robbins*, 528 U.S. at 285, 120 S.Ct. at 764; *Henderson v. Quarterman*, 460 F.3d at 665;

*Busby v. Dretke*, 359 F.3d at 714; *Schaetzle v. Cockrell*, 343 F.3d at 444; *United States v. Williamson*, 183 F.3d 458, 462 (5th Cir. 1999).

Appellate counsel who files a merits brief need not and should not raise every non-frivolous claim but, rather, may select from among them in order to maximize the likelihood of success on appeal. *Smith v. Robbins*, 528 U.S. at 288, 120 S.Ct. at 765; *Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308, 3313, 77 L.Ed.2d 987 (1983); *Henderson v. Quarterman*, 460 F.3d at 665; Busby v. Dretke, 359 F.3d at 714; *Schaetzle v. Cockrell*, 343 F.3d at 445. The process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail is the hallmark of effective appellate advocacy. *Smith v. Murray*, 477 U.S. 527, 536, 106 S.Ct. 2661, 2667, 91 L.Ed.2d 434 (1986); *Jones v. Barnes*, 463 U.S. at 751-52, 103 S.Ct. at 3313.

Nonetheless, appellate counsel is obligated to research relevant facts and law or to make an *informed* decision that certain avenues will not prove fruitful. *See Busby v. Dretke*, 359 F.3d at 714 (a reasonable attorney has an obligation to research relevant facts and law or make an informed decision that certain avenues will not be fruitful); *United States v. Reinhart*, 357 F.3d 521, 525 (5th Cir. 2004)(holding the same); *Schaetzle v. Cockrell*, 343 F.3d at 445 (failure to raise a discrete, purely legal issue, where the precedent could not be more pellucid or

applicable, denies adequate representation). Likewise, solid, meritorious arguments based on directly controlling precedent should be discovered and brought to the appellate court's attention. *United States v. Reinhart*, 357 F.3d at 525; *Schaetzle v. Cockrell*, 343 F.3d at 445; *United States v. Williamson*, 183 F.3d at 463.

Where, as in petitioner's case, appellate counsel presented, briefed, and argued, albeit unsuccessfully, one or more non-frivolous grounds for relief on appeal and did not seek to withdraw from representation without filing an adequate *Anders* brief, the defendant must satisfy *both* prongs of the *Strickland* test in connection with his claims of ineffective assistance by his appellate counsel. *See Roe v. Flores-Ortega*, 528 U.S. 470, 477 & 482, 120 S.Ct. 1029, 1034 & 1037, 145 L.Ed.2d 985 (2000)(holding the dual prongs of *Strickland* apply to complaints of ineffective appellate counsel and recognizing, in cases involving "attorney error," the defendant must show prejudice); *Smith v. Robbins*, 528 U.S. at 287-89, 120 S.Ct. at 765-66 (holding petitioner who argued his appellate counsel rendered ineffective assistance by failing to file a merits brief must satisfy both prongs of *Strickland*); *Busby v. Dretke*, 359 F.3d at 714-17 (applying dual prongs of *Strickland* to a complaint about appellate counsel's failure to present a point of error on appeal).

2. <u>The Absence of Linda Foster from Trial</u>

Movants argue their appellate counsel misconstrued the movants' complaint about Linda Foster's brief absences from their trial and, instead, complained in movants' motion for new trial and on direct appeal that movants had been completely denied an interpreter during trial. *Petitioner's [sic] Reply Response to Government's Response*, *filed February 23, 2007, docket entry no, 1169, at pp. 5-11, 15-18.*

For the reasons set forth at length in section II.B.1. above, movants' complaints about the absence of Linda Foster from the courtroom for brief intervals throughout movants' trial do not satisfy the either prong of *Strickland*.

For similar reasons, movants' claim that their appellate counsel failed to properly frame this same complaint in movants' motion for new trial and direct appeal does not satisfy the prejudice prong of *Strickland*. Movants have failed to allege any specific facts showing how Ms. Foster's absences for brief intervals throughout movants' month-long trial "prejudiced" movants within the meaning of *Strickland.* More specifically, movants have failed to allege any specific facts showing there is a reasonable probability that, but for the alleged failure of their appellate counsel to properly frame movants' complaints about Ms. Foster's absences from trial, the outcome of movants' motion for new trial or direct appeal proceedings would have been

different.  Movants have failed to allege any specific showing Ms. Foster's brief absences actually prevented them from communicating any specific information to their trial counsel at any stage of their joint trial.  There is no reasonable dispute that both movants were furnished live translations of all court proceedings via headsets throughout the entirety of their trial.  Thus, this is not a case in which a non-English speaking criminal defendant was denied a court-appointed interpreter.  Rather, movants complain that Ms. Foster, whose presence was intended solely to serve as a supplemental resource for movants and their counsel should any communications difficulties arise between them, should have been present throughout their entire trial.

Absent some specific factual allegation as to precisely how Ms. Foster's brief absences prevented either movant from communicating any identifiable information to their trial counsel, movants' complaints about her brief absences do not satisfy the prejudice prong of *Strickland.*  Moreover, because movants have failed to allege any *specific* facts showing how they were harmed by Ms. Foster's brief absences from trial, movants' complaints about her brief absences do not rise above the level of harmless error.  Movants' appellate counsels' actions cannot be faulted (as objectively unreasonable) for failing to assert such a tenuous claim in movants' motion for new trial and direct appeal.

Movants' complaint that their appellate counsel failed to properly frame (in their motion for new trial and direct appeal) their complaint about Linda Foster's brief absences during their trial fails to satisfy either prong of *Strickland*.

### 3. Failure to Raise Additional Points of Error

Movants also complain in their amended Section 2255 motion in conclusory fashion that their appellate counsel failed to present unidentified claims and points of error on direct appeal. *Docket entry no. 1151, at pp. 3-5; Petitioner's [sic] Reply Response to Government's Response*, *filed February 23, 2007, docket entry no, 1169, at pp. 2-25.* Out of an abundance of caution and respect for movants' *pro se* status, this Court has liberally all their pleadings in an effort to put some flesh on movants' skeletal assertions of ineffective assistance by their appellate counsel. Movants did complain in their amended section 2255 motion about the trial court's alleged coercion of prosecution witnesses Ruben Carrasco-Valdez and Rosie Soles and the prosecution's allegedly knowing use of perjured testimony by these same two witnesses to secure movants' convictions. *Docket entry no. 1151, at pp. 6-20.* In their separate motions for leave to amend their original Section 2255 motions, movants complained that (1) their trial court coerced Rosie Soles to give perjured testimony and (2) the prosecution engaged in improper jury argument. *Docket entry nos. 1142 & 1158*. In a pleading filed

February 23, 2007, movants argued movant Garcia-Quiroz's appellate counsel failed to (1) adequately review the record from the trial court proceedings, particularly the prosecution's arguments at sentencing, and (2) present points of error on direct appeal complaining about (a) the trial court's coercion of prosecution witnesses Ruben Carrasco-Valdez and Rosie Soles to commit perjury, (b) the trial court's failure to strike the allegedly perjured trial testimony of prosecution witness Ruben Carrasco-Valdez, and (c) the prosecution's knowing use of the perjured testimony of Soles and Carrasco-Valdez. *Docket entry no. 1169.*

   a.   Ruben Carrasco-Valdez's Trial Testimony

Numerous witness identified Ruben Carrasco-Valdez as the third member of the "Los Tres de la Sierra" (along with movants) which ruled marijuana-smuggling operations throughout the Ojinaga, Chihuahua region of Mexico during the late-1990's. S.F. Trial, Volume 1, testimony of Omar Urias Carrillo, at pp. 115-16, 124-26, 148-49, 166; Volume 2, testimony of Omar Urias Carrillo, at p. 287; Volume 3, testimony of Arturo Prieto Moreno, at pp. 699-700; Volume 4, testimony of Arturo Prieto Moreno, at pp. 706-08, 757; Volume 5, testimony of George Olivas Contreras, at pp. 868-70, 905-06; Volume 6, testimony of Jeffery Keith Hebert, at pp. 1281-83, 1312; Volume 7, testimony of Walter Ray Mitchell, at

pp. 1381-84; Volume 7, testimony of Jaime Chacon Morales, at pp. 1484, 1486.

Ruben Carrasco-Valdez entered a plea bargain with the government and furnished the government with much information regarding the Los Tres de la Sierra's operations. Once called to testify at movants' trial, Carrasco-Valdez initially appeared cooperative but later proved to be a reluctant prosecution witness. More specifically, Carrasco-Valdez testified that (1) while employed as a Mexican state police officer, he routinely took bribes from drug dealers to allow drugs to pass through his territory, (2) he left the Mexican state police in 1994-95 and thereafter was approached by drug dealers who asked him to serve as an intermediary with local police officers, paying bribes to allow drugs to pass through, (3) in the mid-1990's he and movant Garcia-Quiroz began their own marijuana-smuggling operation, sending small loads north, (4) they later met movant Balderrama, who quickly took over as the primary leader of the operation, (5) shortly thereafter, the size of their loads increased from 20-30 pounds to 70-90 pounds, (6) Carrasco-Valdez's role in the drug conspiracy was to pay both federal and local law enforcement officers in Mexico to ensure the group's drugs passed through to the north without interruption, (7) he was also in charge of supervising the re-packaging marijuana, i.e., breaking it down into smaller sized packages, and (8) during the period 1997-98,

they shipped marijuana packed with floor tiles, glass tiles, tar, and other substances. S.F. Trial, Volume 2, testimony of Ruben Carrasco-Valdez, at pp. 348-400.

However, Carrasco-Valdez claimed to have no knowledge regarding either (1) the conspiracy's use of cattle haulers to ship marijuana, (2) the murders of Shorty Ocon or Rigoberto Loera, (3) movant Balderrama's legitimate businesses, (4) the sources of the funds movant Balderrama used to transport himself and members of the inner-circle of his marijuana-smuggling operation to France to attend the World Cup or to Sydney, Australia to attend the 2000 Summer Olympic Games, or (5) a folk song written about "Los Tres de la Sierra." *Id.*, at pp. 401-20. In fact, when Carrasco-Valdez repeatedly denied any knowledge of the folk song in question, the Court struck all his testimony regarding same. *Id.*, at pp. 420-21.  When the government continued to attempt to elicit testimony on particular subjects from Carrasco-Valdez without first establishing the witness had personal knowledge of same, movant Balderrama's counsel properly objected and *the Court excused the jury*. *Id.*, at pp. 421-26.

During a hearing held *outside the jury's presence*, this Court admonished the government against attempting to elicit testimony from Carrasco-Valdez without first establishing the witness possessed personal knowledge regarding the subject of inquiry. *Id.*, at pp. 427-33.  The prosecution indicated that

42

Carrasco-Valdez had "de-briefed" the government's investigators about a wide range of subjects about which Carrasco-Valdez was now, apparently, unwilling to discuss in open court under oath. *Id.* Contrary to the suggestions contained in movants' pleadings and motions herein, this Court admonished the government, *not Mr. Carrasco-Valdez*, to avoid entering subject matters about which the witness could not testify based on his own personal knowledge. *Id.* The comments this Court made during that hearing suggesting Mr. Carrasco-Valdez had not been a very good witness or had been a poor witness focused on the fact the government had repeatedly attempted to get Carrasco-Valdez to testify about subjects which Carrasco-Valdez was, apparently, unwilling to discuss while under oath in open court. *Id.*

The Court then engaged in a discussion with defense counsel and Mr. Carrasco-Valdez concerning some of the inconsistencies in the witness' answers to specific questions earlier that day. *Id.*, at pp. 433-48. When Carrasco-Valdez admitted to possessing personal knowledge regarding the folk song which mentioned "Los Tres de la Sierra" and attempted to justify his earlier negative answers to the government's questions about the song by suggesting he had been "confused" by the official court interpreter, the Court admonished Carrasco-Valdez to listen carefully to the questions he was being asked and to answer each question truthfully. *Id.* When one of movant Garcia-Quiroz's

43

defense counsel suggested Carrasco-Valdez was under the
impression the Court was upset with him, the Court made a clear
statement to Carrasco-Valdez and all counsel on the record,
explaining the Court's frustration was not with Carrasco-Valdez
but with the government inquiring into areas when there was no
foundation for inquiring into those areas with this particular
witness:

> I'm not frustrated with Mr. Carrasco. What I'm
> frustrated is we're getting into topics without any
> foundation, because of his testimony it's clear that we
> have no foundation to be in the topics in the first
> place. What I'm frustrated is the jury bears a bunch
> of stuff that they should have never heard because
> there's no foundation, That's my frustration.

*Id.*, at p. 445.

The Court admonished Carrasco-Valdez to simply testify
truthfully when he returned to the stand the following morning.
*Id.*, at pp. 446-47. The Court also directed that no party or
counsel would have any conversations with Mr. Carrasco-Valdez
during that night regarding his trial testimony. *Id.*, at p. 446.

Once Carrasco-Valdez was excused from the courtroom, the
Court's discussion with all counsel continued. The Court once
more admonished the government to avoid questioning Carrasco-
Valdez about particular subjects without first establishing a
proper foundation for same, i.e., establishing Carrasco-Valdez
had personal knowledge regarding that subject, and ruled the
government would not be permitted to re-examine Carrasco-Valdez

44

regarding the folk song which mentioned "Los Tres de la Sierra."
*Id.*, at pp. 449-70.

The following morning, Carrasco-Valdez returned to the stand and the government elicited testimony identifying Balderrama as the leader of the marijuana-smuggling operation, estimating the quantity of drugs sold by the organization at fifty tons, and establishing that Balderrama lavished his associates in the marijuana-smuggling operation with expensive gifts but never gave similar gifts to any of the employees of his "legitimate" businesses. S.F. Trial, Volume 4, testimony of Ruben Carrasco-Valdez, at pp. 473-93.

On cross-examination, Carrasco-Valdez (1) admitted he was a long-term cocaine abuser, (2) claimed that any inconsistencies in his testimony the previous day had been the product of "pressure" and "tension" he was experiencing, but (3) nonetheless insisted Balderrama was the leader of their criminal organization, and (4) swore he had spoken with no one about his testimony over night. *Id.*, at pp. 496, 506, 518, 520-21, 526, 529.

*Outside the jury's presence*, before the conclusion of re-cross examination, this Court (1) once more explained its frustration the previous had been focused on the government inquiring into several subjects with Carrasco-Valdez on the stand without first establishing a proper foundation for those areas of inquiry and (2) made clear defense counsel could inquire into

inconsistencies between Carrasco-Valdez's testimony on the two days, as well as Carrasco-Valdez's understanding that the government had made it clear it was unhappy with Carrasco-Valdez's testimony the first day he was on the stand. *Id.*, at pp. 551-57. Counsel for movant Balderrama then elicited an admission from Carrasco-Valdez before the jury that the government had not been happy with Carrasco-Valdez's testimony the previous day. *Id.*, at pp. 558-61.

Through deceptively selected excerpts from the record during the two days Carrasco-Valdez was on the stand, movants have attempted to paint a picture suggesting this Court coerced Carrasco-Valdez into testifying in a manner favorable to the government and, in their view, thereby giving perjured testimony. On the contrary, however, this Court took great pains to avoid creating the impression in Carrasco-Valdez's mind, or anyone else's, that it wanted him to do anything other than simply to (1) listen carefully to the questions directed to him as translated by the official court reporter and (2) answer each such question truthfully. The consistent focus of this Court's numerous expressions of frustration during Carrasco-Valdez's testimony was with *the government's* repeated failure to establish a foundation for questioning Carrasco-Valdez about a particular subject without first establishing Carrasco-Valdez had personal knowledge of that particular subject. This Court also took great

care to express its frustrations on that subject outside the presence of the jury. Movants' suggestions that this Court attempted to coerce Carrasco-Valdez into testifying in a particular manner (other than truthfully) are utterly without factual foundation and completely refuted by even a cursory examination of the actual trial record.

Movants argue their appellate counsel should have raised a point of error on direct appeal complaining about this Court's failure to "strike" Carrasco-Valdez's entire testimony as "perjured" or the product of coercion by the Court. However, movants cite no authority justifying, much less mandating, such action by this Court. Nor has this Court's independent research disclosed any authority suggesting an entire witness' trial testimony must be stricken simply because the trial court expressed frustration, *outside the jury's presence*, with the manner in which the prosecution examined that witness. That movants disagree with portions of Carrasco-Valdez's trial testimony is an insufficient basis for either striking same from the record or denying movants' jury the right to consider Carrasco-Valdez's testimony in rendering its verdict. Movants' trial counsel were permitted to engage in free-ranging cross-examination of Carrasco-Valdez. The movants' jury was the ultimate arbiter of Carrasco-Valdez's credibility as a witness.

Movants have failed to identify any error made by this Court with regard to its evidentiary rulings concerning Carrasco-Valdez's trial testimony.  Movants have likewise failed to identify any specific testimony given by Carrasco-Valdez which they allege was factually inaccurate.  While movants have furnished a purported affidavit from Carrasco-Valdez in which he recants that portion of his trial testimony estimating the total quantity of drugs transported by the Los Tres de law Sierra organization at a figure above the 30,000 kilograms alleged in the indictment against movants, Carrasco-Valdez was not a significant witness with regard to this particular subject. *See note 2, supra.*  Recanting affidavits are viewed with extreme suspicion in this Circuit. *Summers v. Dretke*, 431 F.3d 861, 872 (5th Cir. 2005), *cert. denied* 549 U.S. 840 (2006); *Wilkerson v. Cain*, 233 F.3d 886, 893 (5th Cir. 2000).

Moreover, even excluding the trial testimony of Ruben Carrasco-Valdez and Rosie Soles, other prosecution witnesses, including individuals who transported drugs for movants as well as law enforcement officers involved in the seizure of marijuana and cash transported by movants' employees, conservatively established the quantity of marijuana transported by the Los Tres de la Sierra organization during its approximately six years of operation at more than double the 30,000 kilogram figure charged

in movants' indictment.[5]  Simply put, the testimony from movants'

[5] A DEA special agent testified regarding seizure of
marijuana made by law enforcement agents from movants'
accomplices, including seizures of (1) 463 pounds of marijuana on
January 17, 1996, (2) 1210 pounds on July 1, 1999, and (3) 1504
pounds on November 3, 1999. S.F. Trial, Volume 3, testimony of
Wes Hearon, at pp. 576-85, 594-602, 607-19.
    A retired Border Patrol agent testified regarding a seizure
of 1,429 pounds of marijuana on December 11, 1997, S.F. Trial,
Volume 7, testimony of Robert Bollier, at pp. 1442-48.
    A Border Patrol agent testified about seizures of (1)
1602.03 pounds of marijuana on June 25, 1998 and (2) an
unspecified quantity of marijuana in the possession of movants'
co-defendant Chapa on November 3, 1999. S.F. Trial, Volume 7,
testimony of Jack D. Bates, at pp. 1495-1513.
    A pair of Border Patrol agents testified about a seizure of
1299.3 pounds of marijuana from movants' co-defendant Bernal on
November 5, 1998. S.F. Trial, Volume 8, testimony of Guadalupe
Trevino, Jr., at pp. 1586-92; testimony of Wynn Walter Anderson,
at pp. 1603-10.
    A Kansas Highway Patrol officer testified about the seizure
of $148,900 in cash from a vehicle driven by movants' accomplice
Rito Mendoza on September 10, 1998. S.F. Trial, Volume 8,
testimony of Brian K. Smith, at pp. 1620-30.
    Another Kansas Highway Patrol officer testified about a
seizure of another $148,950 in cash from a horse trailer hauled
by Rito Mendoza on December 10, 1998. S.F. Trial, Volume 8,
testimony of Ray Bailiff, at pp. 1636-41.
    A pair of DEA agents testified about the seizure on November
9, 1999 of approximately 488 kilograms of marijuana from an
abandoned flatbed truck linked to movants' co-defendant Ricardo
Chapa. S.F. Trial, Volume 8, testimony of Michael Patrick
O'Brien, at pp. 1648-52; testimony of Michael Keene, at pp. 1679-
91.
    A federal anti-drug task force officer testified about the
seizure of $110,670 from movants' accomplice Omar Carrillo Urias
on September 10, 1999. S.F. Trial, Volume 8, testimony of Marc
Fletcher, at pp. 1753-62.
    A Border Patrol agent testified about the seizure of 2011
pounds of marijuana from movants' accomplice George Olivas
Contreras a/k/a "Carlos Corona" on October 20, 1999. S.F. Trial,
Volume 8, testimony of Gregory McConnell, at pp. 1768-73.
    Employing the most conservative methodology possible, the
prosecution's witnesses at trial identified approximate ten
thousand pounds of marijuana and approximately half a million
dollars in cash seized from movants' accomplices during the

trial established that (1) approximately five tons of marijuana shipped by the Los Tres de la Sierra organization was seized by law enforcement officer during the years the organization operated, *see note 5 supra*, and (2) the amount of the organization's marijuana seized annually by law enforcement was usually around ten percent of the total amount shipped to the United States.[6]  Thus, there was more than ample corroboration in

---

course of the operations of Los Tres de la Sierra.  Numerous prosecution witness also established the quantity of drugs and money seized from the organization was only a very small fraction of the total quantities of drugs and money which "got through" during that same time frame. *See, e.g.,* S.F. Trial, Volume 1, testimony of Omar Urias Carrillo, at pp. 136-210 and Volume 2, testimony of Omar Urias Carrillo, at pp. 263-73, 318 (only a few loads were intercepted annually during calendar years 1997-99 and that more than twenty loads made it through each of those years).

[6] Prosecution witness Omar Urias Carrillo testified without contradiction that (1) he began making runs for movants' organization in late-1996, (2) he made two runs a week for approximately two months near the end of 1996, (3) he continued making runs and also "baby-sat" others who made runs during 1997, when shipments increased in size to a range of 800 to 1,200 pounds, (4) more than twenty crossings were made in 1997, with only two or three captured or otherwise lost, (5) more than twenty loads were shipped with tile in 1998, ranging in size from 700 to 1,500 pounds, at least four of which were at the upper end of this range, (6) more than ten additional shipments were made in 1998 of sizes ranging from 1,400 to 1,500 pounds in the back of trucks in a method the organization called "La Brava," (7) more than twenty tile loads were shipped in 1999, with additional shipments made using tar barrels, (8) tar barrel shipments usually ranged from 1,000 to 1,200 pounds, although one such load weighed in at 2011 pounds, (9) Luciano Chapa personally transported eight-to-nine tar barrel loads in 1999 and was only caught once, and (10) at least five "La Brava" loads were also shipped in 1999, ranging in size from 800 to 1,000 pounds. S.F. Trial, Volume 1, testimony of Omar Urias Carrillo, at pp. 107-210.

the record for Ruben Carrasco-Valdez's estimate that Los Tres de la Sierra shipped at least fifty tons of marijuana into the United States during its years of operation.

In sum, movants' assertion that Carrasco-Valdez committed perjury during his trial testimony when he estimated the total quantity of marijuana transported by Los Tres de la Sierra at over 50 tons are refuted by (1) the trial record, including the corroborating testimony of a small army of other prosecution witnesses, and (2) the simple fact Carrasco-Valdez pleaded guilty to participating in a drug conspiracy which involved more than 64 tons of marijuana, well in excess of the 30,000 kilograms alleged in the indictment against movants. S.F. Trial, Volume 3, testimony of Ruben Carrasco-Valdez, at pp. 487-90.

Movants have failed to identify any legal authority warranting or mandating the exclusion of Carrasco-Valdez's testimony from the jury. This Court finds no legal basis for so doing. Under these circumstances, the failure of movants' appellate counsel to argue on direct appeal that Carrasco-Valdez's trial testimony should have been stricken neither (1) caused the performance of movants' appellate counsel to fall below an objective level of reasonableness nor (2) "prejudiced" movants within the meaning of *Strickland*. *See Johnson v. Cockrell*, 306 F.3d 249, 255 (5th Cir. 2002)(holding there was nothing deficient in counsel's failure to object to the admission

of psychiatric testimony that was admissible under then-existing precedent), *cert. denied*, 538 U.S. 926 (2003); *Robison v. Johnson*, 151 F.3d 256, 261 (5th Cir. 1998)(nothing deficient regarding trial counsel's failure to seek admission of a document the state court concluded was inadmissible), *cert. denied*, 526 U.S. 1100 (1999); *Emery v. Johnson*, 139 F.3d 191, 198 (5th Cir. 1997)(failure to assert a meritless objection cannot be the grounds for a finding of deficient performance), *cert. denied*, 525 U.S. 969 (1998); *Meanes v. Johnson*, 138 F.3d 1007, 1012 (5th Cir. 1998)(holding counsel was not constitutionally deficient for failing to raise an objection if, at the time of trial, the objection would have been futile in light of existing state law and the right asserted in the proposed objection was not clearly established), *cert. denied*, 525 U.S. 968 (1998).

     b.   <u>This Court's Discussions with Rosie Soles</u>

The circumstances surrounding the trial testimony of prosecution witness Rose Soles, including this Court's dialogue with her the day before she testified, were detailed in Section II.B.3. above. To reiterate briefly, Rosie Soles entered into a plea agreement with the government which compelled her to testify against movants if called upon to do so. When she subsequently indicated to prosecutors that she would refuse to testify against movants, including her paramour Balderrama, this Court briefly inquired whether she understood the consequences of her decision.

S.F. Trial, Volume 8, at pp. 1779-90. More specifically, this
Court inquired whether she understood she would forfeit the
benefits of her plea agreement and, based upon her prior guilty
plea, face a potential sentence ranging from 360 months to life
imprisonment if she failed to fulfill her obligations under her
plea agreement, i.e., if she failed to testify truthfully when
requested to do so by the government. *Id.*, at pp. 1781-84.
Movant Balderrama's co-counsel at trial (attorney Daniel Hurley)
then addressed the Court and Mrs. Soles and advised everyone
present that (1) movant Balderrama wished Ms. Soles to take
advantage of her plea bargain and (2) she had movant Balderrama's
"blessing" to testify. *Id.*, at p. 1784. Only after movant
Balderrama's counsel made that announcement did Mrs. Soles relent
and indicate she would testify at movants' trial. *Id.* In point
of fact, Mrs. Soles' change of heart, i.e., her decision to
testify, resulted *not* from anything this Court said or did but,
rather, exclusively from the urging of movant Balderrama, through
his counsel of record.

While movants have furnished the Court with documents in
which Mrs. Soles purports to "recant" her trial testimony, in
fact, those documents consist of little more than her assertions
that she went "coerced" and "threatened" when she testified.
Movants have furnished this Court with (1) no documentation or
specific factual allegations identifying any factual inaccuracies

in Mrs. Soles' trial testimony and (2) no legal authority suggesting there was any reversible error committed by this Court's vis-a-vis Mrs. Soles. Movants do erroneously allege this Court refused to permit their trial counsel to cross-examine Mrs. Soles. *Petitioner's [sic] Reply response to Government's Response, filed February 23, 2007, docket entry no. 1169, at p. 20.* However, movants ignore the fact Mrs. Soles testified extensively on cross-examination by both their counsel. S.F. Trial, Volume 10, testimony of Rosie Soles, at pp. 2063-69, 2085-2104. Movants' obvious confusion on this point may result from the fact that, because of a previously scheduled medical procedure, i.e., a CAT scan, Mrs. Soles' cross-examination was postponed until the day after she gave her testimony on direct.[7]

Because movants have failed to identify either (1) any reversible error committed by this Court in connection with the trial testimony of Rosie Soles or (2) any specific factual inaccuracies in Mrs. Soles' trial testimony, the failure of movants' appellate counsel to raise points of error on direct alleging this Court coerced Mrs. Soles into committing perjury neither caused the performance of movants' appellate counsel to fall below an objective level of reasonableness nor "prejudiced" movants within the meaning of *Strickland*.

---

[7] The Court discussed this situation with Mrs. Soles at the same hearing where she changed her mind about testifying. S.F. Trial, Volume 8, at pp. 1785-88.

c.   Movants' *Giglio-Napue* Claims

Movants argue their appellate counsel should have raised points of error on direct appeal arguing the prosecution knowingly used the perjured testimony of Ruben Carrasco-Valdez and Rosie Soles to secure movants' convictions.

The prosecution denies a criminal defendant due process when it knowingly uses perjured testimony at trial or allows untrue testimony to go uncorrected. *Giglio v. United States*, 405 U.S. 150, 153-54, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *Napue v. Illinois*, 360 U.S. 264, 269-70, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959); *United states v. Gonzales*, 436 F.3d 560, 580 (5th Cir. 2006), *cert. denied*, 547 U.S. 1180 (2006); *United States v. Webster*, 392 F.3d 787, 800-81 (5th Cir. 2004). To succeed in showing a due process violation from the use of allegedly perjured testimony, a defendant has the burden of establishing that (1) the witness in question actually gave false testimony, (2) the falsity was material in that there was a reasonable likelihood that it affected the judgment of the jury, and (3) the prosecution used the testimony in question *knowing* that it was false. *Giglio v. United States*, 405 U.S. at 153-54, 92 S.Ct. at 766; *United states v. Gonzales*, 436 F.3d at 580; *United States v. Webster*, 392 F.3d at 801.

For the reasons set forth at length in Sections II.C.3.a. & b. above, movants have failed to furnish this Court with any

specific factual allegations, much less any evidence, establishing there were any factual inaccuracies in the trial testimony of either Ruben Carrasco-Valdez or Rosie Soles. Thus, movants' complaints fail to satisfy the initial prong of the *Giglio-Napue* standard. *See United States v. Gonzales*, 436 F.3d at 580 (rejecting *Giglio* claim premised on allegedly false prosecutorial argument where the record showed there was nothing factually inaccurate in the prosecutor's argument); *United States v. Webster*, 392 F.3d at 801 (rejecting a *Giglio-Napus* claim where the movants failed to identify any specific statements made by the witnesses in question as false and, instead, like movants herein, offered only vague conclusions about the ultimate falsity of the witnesses' trial testimony). Likewise, movants have utterly failed to allege any specific facts showing the government *knowingly* used any perjured testimony from either of these witnesses, or any other witnesses, to secure movants' convictions.[8]

---

[8] This Court is convinced to a moral certainty that Ruben Carrasco-Valdez testified falsely when he denied he had any personal knowledge regarding the murders of Shorty Ocon and Rigoberto Loera. However, this fact does not help movants because Carrasco-Valdez's self-serving denials were not material to any issue before the jury at movants' trial. Moreover, the government (along with every other rational human being in the courtroom) appeared convinced Carrasco-Valdez knew much about both murders and expressed frustration when it could not get Carrasco-Valdez to admit same in front of the jury. S.F. Trial, Volume 2, testimony of Ruben Carrasco-Valdez, at pp. 405-06, 427-33. Under such circumstances, the government could hardly have been said to have "knowingly used" Carrasco-Valdez's

Because movants have failed to identify any factually inaccurate or otherwise false trial testimony by either Rosie Soles or Ruben Carrasco-Valdez which was material to the government's case against movants, the failure of movants' appellate counsel to raise *Giglio-Napue* claims based upon the trial testimony of Ruben Carrasco-Valdez and Rosie Soles neither caused the performance of movants' appellate counsel to fall below an objective level of reasonableness nor "prejudiced" movants within the meaning of *Strickland*.

4. <u>Lack of Spanish Fluency</u>

Movants complaint generically that their appellate counsel were insufficiently fluent in Spanish to permit movants to confer with said counsel. However, as explained in Sections II.C.2. and II.C.3. above, movants have not identified with specificity any potentially meritorious points of error which they claim their appellate counsel should have raised on direct appeal but failed to do so. This is precisely the type of conclusory assertion which fails to raise a cognizable claim of ineffective assistance. *United States v. Demik*, 489 F.3d at 646; *United States v. Holmes*, 406 F.3d at 361.

---

superficially false denials of his own knowledge of the murders in question to help secure movants' convictions.

### III. **Coerced Testimony & *Giglio-Napue* Claims**

Movants complain that this Court coerced Ruben Carrasco-Valdez and Rosie Soles to give false, perjured, testimony during movants' trial and that the government knowingly used unspecified perjured testimony by these same two witnesses to secure movants' convictions.  For the reasons set forth at length in Sections II.B.3. and II.C.3. above, movants have failed to allege any specific facts showing (1) this Court "coerced" either Carrasco-Valdez or Soles to testify in any manner inappropriate under applicable law, (2) this Court ever encouraged either of these two witnesses to testify falsely, (3) this Court committed any reversible error with regard to the admission of the testimony of either Carrasco-Valdez or Soles, or (4) either Carrasco-Valdez or Soles gave any factually inaccurate testimony which was *material* to any issue before movants' jury.  Under such circumstances, movants' complaints of "coerced" testimony and the allegedly knowing use by the government of unspecified perjured testimony by prosecution witnesses Carrasco-Valdez and Soles are utterly without even arguable merit.

### IV. **Double Jeopardy Claim**

For the reasons set forth at length in Section II.B.4. above, movants are entitled to have their convictions, and their corresponding sentences, under Count Three of the indictment against them vacated and set aside.

## V. Improper Prosecutorial Arguments

Movants argue the prosecution engaged in improper jury argument; specifically by vouching for the credibility of prosecution witnesses, attacking movants as "King Cobras" compared to their accomplices whom the prosecution termed "mere snakes," and personally attacking the professional integrity of movants' trial counsel. *Petitioner's [sic] Motion for Leave to Amend, filed December 18, 2006, docket entry no. 1158, at pp. 6-12.*

A.    Procedural Default

Respondent correctly points out movants not only failed to timely object to this allegedly improper jury argument but also failed to raise complaints about the allegedly improper jury argument on direct appeal.  While movants have shown themselves fully capable of identifying and asserting claims of ineffective assistance by their trial and appellate counsel in their pro se pleadings in this Section 2255 proceeding, they did not do so with regard to either their trial counsels' failures to timely object to the allegedly improper prosecution arguments in question or their appellate counsels' failures to raise points of error on direct appeal complaining about the same prosecutorial argument.  Respondent is correct that, under such circumstances, movants have procedurally defaulted on their complaints regarding the prosecutorial arguments in question.

A Section 2255 movant who fails to raise a constitutional or jurisdictional issue on direct appeal waives the issue on collateral review of his conviction, unless there is cause for the default and actual prejudice as a result. *United States v. Willis*, 273 F.3d 592, 595 (5th Cir. 2001)(in a § 2255 proceeding, where the movant failed to timely object and also failed to present the complaint on direct appeal, "to obtain collateral relief based on trial errors to which no contemporaneous objection was made, a convicted defendant must show both (1) 'cause' excusing his double procedural default, and (2) 'actual prejudice' resulting from the errors of which he complains."); *United States v. Kallestad*, 236 F.3d 225, 227 (5th Cir. 2000)("A section 2255 movant who fails to raise a constitutional or jurisdictional issue on direct appeal waives the issue for collateral attack on his conviction, unless there is cause for the defendant and prejudice as a result.").

Moreover, not all complaints about a sentence may be brought initially through a Section 2255 motion. Section 2255 relief is reserved for errors of constitutional dimension and other injuries that could not have been raised on direct appeal and, if left unaddressed, would result in a complete miscarriage of justice. *United States v. Cervantes*, 132 F.3d 1106, 1109 (5th Cir. 1998); *United States v. Payne*, 99 F.3d 1273, 1281 (5th Cir. 1996); *United States v. Gaudet*, 81 F.3d 585, 589 (5th Cir. 1996).

Section 2255 does not reach errors not of a constitutional or jurisdictional magnitude that could have been reached by a direct appeal. *United States v. Rocha*, 109 F.3d 225, 229 (5th Cir. 1997); *United States v. Payne*, 99 F.3d at 1281; *United States v. Seyfert*, 67 F.3d 544, 546 (5th Cir. 1995). "Nonconstitutional claims that could have been raised in a direct appeal, but were not, may not be asserted in a collateral proceeding." *United States v. Payne*, 99 F.3d at 1281.

A defendant may not raise an issue, regardless of whether constitutional or jurisdictional in nature for the first time on collateral review without showing both "cause" and "actual prejudice" resulting from the error. *United States v. Kallestad*, 236 F.3d at 227; *United States v. Cervantes*, 132 F.3d at 1109; *United States v. Gaudet*, 81 F.3d at 589. "A movant is barred from raising jurisdictional and constitutional claims for the first time on collateral review unless he demonstrates cause for failing to raise the issue on direct appeal and actual prejudice resulting from the error." *United States v. Patten*, 40 F.3d 774, 776 (5th Cir. 1994), *cert. denied*, 515 U.S. 1132 (1995).

Because movants failed to timely object to the allegedly improper prosecutorial arguments and failed to present any complaints about those arguments to the Fifth Circuit on direct appeal, movants have procedurally defaulted on their complaints about same. Likewise, because movants have alleged no specific

facts showing that either the failures of their trial counsel to timely object to the arguments in question or the failures of their appellate counsel to present points of error complaint about the arguments in question constituted ineffective assistance, movants cannot overcome their procedural default. Movants complaints about the prosecution's allegedly improper jury arguments do not warrant relief under Section 2255.

B.  No Merit

Alternatively, this Court finds no legitimate basis for criticizing the prosecution's closing jury argument.

An improper prosecutorial argument which does *not* implicate a specific constitutional provision is not cognizable on collateral review unless the defendant shows an abridgment of due process, i.e., the improper argument rendered the proceeding fundamentally unfair. *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986)("it is not enough that the prosecutors' remarks were undesirable or even universally condemned.  The relevant inquiry is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process").  This standard applies to the review of complaints of improper prosecutorial argument raised in federal direct appeals. *See United States v. Young*, 470 U.S. 1, 11-12, 105 S.Ct. 1038, 1044-45, 84 L.Ed.2d 1 (1985)("a criminal conviction is not to be

lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial"); *United States v. Thompson*, 482 F.3d 781, 785 (5th Cir. 2007) (inappropriate prosecutorial comments, standing alone, would not justify reversal of a criminal conviction obtained in an otherwise fair proceeding); *United States v. Hitt*, 473 F.3d 146, 161 (5th Cir. 2006)(improper argument warrants reversal when taken as a whole in the context of the entire case, it prejudicially affected substantial rights of the defendant), *cert. denied*, 549 U.S. 1360 (2007); *United States v. Gamez-Gonzalez*, 319 F.3d 695, 701 (5th Cir. 2003)(inappropriate prosecutorial argument constitutes reversible error only if it is so improper as to affect the defendant's substantial rights), *cert. denied*, 538 U.S. 1068 (2003); *United States v. Virgen-Moreno*, 265 F.3d 276, 290-91 (5th Cir. 2001)(the determinative question is whether the prosecution's remarks cast serious doubt on the correctness of the jury's verdict), *cert. denied*, 534 U.S. 1095 (2002).

Improper jury argument by the state does not present a claim of constitutional magnitude in a federal habeas action unless it is so prejudicial the state court trial was rendered fundamentally unfair within the meaning of the Due Process Clause

of the Fourteenth Amendment. *Darden v. Wainwright*, 477 U.S. at 181, 106 S.Ct. at 2471; *Harris v. Cockrell*, 313 F.3d 238, 245 (5th Cir. 2002), *cert. denied*, 540 U.S. 1218 (2004). To establish a prosecutor's remarks were so inflammatory, the petitioner must demonstrate the misconduct was persistent and pronounced or the evidence of guilt so insubstantial the conviction would not have occurred but for the improper remarks. *Harris v. Cockrell*, 313 F.3d at 245; *Turner v. Johnson*, 106 F.3d 1178, 1188 (5th Cir. 1997); *Nichols v. Scott*, 69 F.3d 1255, 1278 (5th Cir. 1995)(wholly apart from the issue of procedural bar, failure to object to an argument is an indication it was not perceived as having a substantial adverse effect or would not naturally and necessarily be understood as advancing improper considerations), *cert. denied*, 518 U.S. 1022 (1996); *Milton v. Procunier*, 744 F.2d 1091, 1095 (5th Cir. 1984)(holding the same), *cert. denied*, 471 U.S. 1030 (1985); *Buxton v. Collins*, 925 F.2d 816, 825 (5th Cir. 1991)(recognizing the four proper areas for prosecutorial jury argument are summation of the evidence, reasonable inference from the evidence, answers to opposing counsel's argument, and pleas for law enforcement), *cert. denied*, 498 U.S. 1128(1991).

"A prosecutor's improper argument will, in itself, exceed constitutional limitations in only the most egregious cases." *Harris v. Johnson*, 313 F.3d at 245 n.12; *Ortega v. McCotter*, 808

F.2d 406, 410 (5th Cir. 1987); *Menzies v. Procunier*, 743 F.2d

281, 288-89 (5th Cir. 1984).  The burden is on the habeas

petitioner to show a reasonable probability that, but for the

prosecutor's remarks, the result of the trial would have been

different. *Nichols v. Scott*, 69 F.3d at 1278.

> Even when a defendant timely objects to remarks made by
> a prosecutor in closing argument, the defense burden of
> establishing that such remarks denied the defendant a
> fair trial is substantial.  We accord wide latitude to
> counsel during closing argument.  In so doing, we
> analyze closing argument in the context of the trial as
> a whole, recognizing that [i]nappropriate prosecutorial
> comments, standing alone will not justify reversal of a
> conviction obtained in an otherwise fair proceeding.
> The determinative question in our inquiry is whether
> the prosecutor's remarks cast serious doubt on the
> correctness of the jury's verdict.  In answering this
> question, we consider (1) the magnitude of the
> prejudicial effect of the prosecutor's remarks, (2) the
> efficacy of any cautionary instruction by the judge,
> and (3) the strength of the evidence supporting the
> conviction.

*United States v. Thompson*, 482 F.3d at 785 (footnotes omitted).

This Court has carefully reviewed each of the allegedly

improper prosecutorial jury arguments identified by the movants

and independently concludes movants have not only once more

missed the mark but have also attempted to completely distort the

record from their trial.  For instance, movants complain the

prosecution improperly criticized them for employing court-

appointed trial counsel to defend themselves despite movants'

ample financial resources. *Petitoner's [sic] Motion for leave to*

*Amend, filed December 18, 2006, docket entry no. 1158, at p. 8.*

In fact, however, even a cursory reading of the portion of the trial record in question reveals "the attorneys" to whom the prosecution referred were *not* movants' trial counsel but, rather, the attorneys retained by Rosie Soles to go to Australia to help movants fight extradition from that continent. S.F. Trial, Volume 13, at p. 2846.

Contrary to movants' contentions, at no point did the prosecution refer to movants' trial counsel as "clowns." The only passages in the prosecution's closing argument identified by movants which refer to anything even vaguely resembling movants' allegation that the prosecution accused movants' trial counsel or engaging in "magic trickery" consist of prosecutor Roomberg's statements that (1) unlike defendants' Balderrama and Bernal's counsel, he would not tell jokes, (2) he could not do magic tricks, and (3) he believed the defense had attempted to engage in "smoke and mirrors" tactics by questioning witnesses about "Mr. Garcia" when, in fact, Rosie Soles and other participants in the Los Tres de la Sierra organization knew defendant Garcia-Quiroz by the name "Quiroz." S.F. Trial, Volume 13, at pp. 2853-54. There was nothing improper or inappropriate about any of these arguments.

Contrary to movants' assertions, the prosecution did not personally vouch for the credibility of individual prosecution witnesses. However, the prosecution did make the perfectly

legitimate argument that the prosecution should find the testimony of certain prosecution witnesses to be credible based on the evidence admitted at trial:

> Also, as I said on my opening statement, if you use your common sense, you've heard all the evidence now, you have the law Judge Furgeson gives you, you will determine truth and in the end you will determine justice.
>
> A lot of what this case comes down to is credibility. Listening to all the witnesses. And how do you judge their credibility? The same way you do it every day in life: You listen to what they say, you look at them when they talk. Does their story jive? is it corroborated? Do they have a bias or motive not to tell you the truth? You decide that, not Defense counsel. Their opinion doesn't make a difference. My opinion doesn't make a difference. Yours is the only opinion that makes a difference when it comes to judging the evidence.
>
> You've heard the law enforcement officers testify. You judge if they were telling you the truth. I would submit to you, ladies and gentlemen, their credibility is untarnished and untouched.

S.F. Trial, Volume 13, at pp. 2846-47.

Contrary to movants' assertions, the prosecution openly criticized Ruben Carrasco-Valdez's trial testimony based on what the prosecution argued was Carrasco-Valdez's deliberate down-playing or minimizing of his own role in the drug conspiracy. *Id.*, at pp. 2850-51. The prosecution then contrasted Carrasco-Valdez's self-serving testimony with that of the clearly reluctant witness Rosie Soles, who had admitted she had initially refused to de-brief the government even after she had entered her guilty plea (S.F. Trial, Volume 9, testimony of Rosie Soles, at

p. 1927) and whom the prosecution argued, based on all the evidence then before the jury, had testified truthfully. S.F. Trial, Volume 13, at p. 2851.  The prosecution also properly reminded the jury that both Ruben Carrasco-Valdez and Rosie Soles had entered guilty pleas to charges they had served in leadership roles in drug-smuggling organizations which had transported more than 30,000 kilograms of marijuana. *Id.*, at pp. 2855-56.

There was absolutely nothing improper with the prosecution's arguments that the law enforcement officers who testified at trial had done so truthfully or that Rosie Soles' trial testimony was more credible than the self-serving testimony of Ruben Carrasco-Valdez.  Both of those arguments were reasonable inferences drawn from the evidence then-properly before the jury. *See Buxton v. Collins*, 925 F.2d at 825 (recognizing the four proper areas for prosecutorial jury argument are summation of the evidence, reasonable inference from the evidence, answers to opposing counsel's argument, and pleas for law enforcement).

Likewise, the prosecution's arguments bolstering the credibility of various prosecution witnesses were a wholly appropriate response to defense counsels' attacks on the credibility of these same prosecution witnesses.  The prosecution's remarks in question came *after* the movants' counsel, as well as other defense counsel, attempted to cast aspersions on the credibility of all the prosecution witnesses

who had signed plea agreements compelling them to testify against movants. It is permissible for the prosecution, in response to attacks upon the credibility of a prosecution witness, to argue that a fair inference from the evidence is that the witness in question had no reason to lie. *United States v. Washington*, 44 F.3d 1271, 1278 (5th Cir. 1995), *cert. denied*, 514 U.S. 1132 (1995).

> As a general rule, the prosecutor may not bolster the credibility of its witnesses by personally attesting to their truthfulness, as doing so may imply that the prosecutor has additional personal knowledge about the witness and facts that confirm such witness' testimony, or may add credence to such witness' testimony. Where defense counsel insinuates that the government's witnesses perjured themselves because they entered into plea-bargains and were hoping to receive lighter sentences, a prosecutor may rebut those accusations, even if those statements otherwise would amount to a bolstering argument.

*United States v. Taylor*, 210 F.3d 311, 318-19 (5th Cir. 2000).

The prosecution did refer to movants as the "King Cobras" of the marijuana smuggling operation and their accomplices who had testified against movants as mere "snakes." S.F. Trial, Volume 13, at p. 2853. However, that isolated, hyperbolic, reference did not render movants' trial fundamentally unfair.

Because none of movants' complaints about alleged inappropriate prosecutorial jury argument addressed arguments which rendered movants' entire trial fundamentally unfair, the failure of movants' trial counsel to object to same neither

caused the performance of said counsel to fall below an objective level of reasonableness nor "prejudiced" movants within the meaning of *Strickland*. Likewise, the failure of movants' appellate counsel to raise points of error on direct appeal complaining about these same alleged improper prosecutorial jury arguments did not cause the performance of movants' appellate counsel to fall below an objective level of reasonableness and did not "prejudice' movants within the meaning of *Strickland*. Accordingly, movants cannot overcome their procedure default on their complaints about alleged improper prosecutorial jury arguments. Moreover, even when examined on the merits, movants' complaints about alleged improper prosecutorial jury argument do not warrant relief under Section 2255 because none of the alleged improper arguments (whether viewed individually or collectively) rendered movants' trial fundamentally unfair.

## VI. <u>Request for an Evidentiary Hearing</u>

Movants have requested an evidentiary hearing. "A motion brought under 28 U.S.C. 2255 can be denied without a hearing only if the motion, files, and records of the case conclusively show that the prisoner is entitled to no relief." *United States v. Bartholomew,* 974 F.2d 39, 41 (5th Cir. 1992). However, when, as here, a movant for relief under Title 28 U.S.C. §2255 has presented claims that are either contrary to law or plainly refuted by the record, an evidentiary hearing is not necessary.

*See United States v. Bartholomew*, 974 F.2d at 41 (holding there was no abuse of discretion in denying a Section 2255 motion without a hearing where the movant's assertions of ineffective assistance was wholly conclusionary in nature and refuted by reference to the record itself); *United States v. Plewniak*, 947 F.2d 1284, 1290 (5th Cir. 1991)(holding an evidentiary hearing is not necessary when the file and records conclusively show the prisoner entitled to no relief), *cert. denied*, 502 U.S. 1120 (1992).

The record herein refutes all but one of movants' claims. Moreover, where, as here, the movant has furnished only vague conclusions in support of his claims, no evidentiary hearing is necessary. *See United States v. Demik*, 489 F.3d 644, 646-47 (5th Cir. 2007)(conclusory allegations of ineffective assistance were insufficient to warrant an evidentiary hearing), *cert. denied*, ___ U.S. ___, 128 S.Ct. 456, 169 L.Ed.2d 319 (2007); *United States v. Edwards*, 442 F.3d 258, 264 (5th Cir. 2006)(conclusions devoid of specific factual support do not require an evidentiary hearing), *cert. denied*, 548 U.S. 908 (2006).  This Court has granted movants relief on the only claim they have supported with fact-specific allegations showing their trial counsels' performance dipped below an objective level of reasonableness. None of movant's other conclusory allegations  in this case merit an evidentiary hearing.

# VII. <u>Certificate of Appealability</u>

Before a movant may appeal the denial of a motion to vacate sentence filed under Section 2255, the movant must obtain a Certificate of Appealability ("CoA"). *Hohn v. United States*, 524 U.S. 236, 239-40, 118 S.Ct. 1969, 1972, 141 L.Ed.2d 242 (1998); *United States v. Hall*, 455 F.3d 508, 513 (5th Cir. 2006), *cert. denied*, 549 U.S. 1343 (2007); *United States v. Webster*, 392 F.3d 787, 791 (5th Cir. 2004); 28 U.S.C §2253(c)(1)(B). Appellate review is limited to the issues on which a CoA is granted. *See Larry v. Dretke*, 361 F.3d 890, 896 (5th Cir. 2004)(holding a CoA is granted on an issue-by-issue basis, thereby limiting appellate review to those issues), *cert. denied*, 543 U.S. 893 (2004); *Crutcher v. Cockrell*, 301 F.3d 656, 658 n.10 (5th Cir. 2002), (holding the same); *Jones v. Cain*, 227 F.3d 228, 230 n.2 (5th Cir. 2000), (holding the same); *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997), (holding the scope of appellate review of denial of a habeas petition limited to the issues on which CoA has been granted). In other words, a CoA is granted or denied on an issue-by-issue basis, thereby limiting appellate review to those issues on which CoA is granted alone. *Larry v. Dretke*, 361 F.3d at 896; *Crutcher v. Cockrell*, 301 F.3d at 658 n.10; *Lackey v. Johnson*, 116 F.3d at 151; *Murphy v. Johnson*, 110 F.3d 10, 11 n.1 (5th Cir. 1997); 28 U.S.C. §2253(c)(3). This Court is

authorized to address the propriety of granting a CoA *sua sponte*. *Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).

A CoA will not be granted unless the movant makes a substantial showing of the denial of a constitutional right. *Hohn v. United States*, 524 U.S. at 240, 118 S.Ct. at 1972; *Tennard v. Dretke*, 542 U.S. 274, 282, 124 S.Ct. 2562, 2569, 159 L.Ed.2d 384 (2004); *Miller-El v. Johnson*, 537 U.S. 322, 336, 123 S.Ct. 1029, 1039, 154 L.Ed.2d 931 (2003); *Slack v. McDaniel*, 529 U.S. 473, 483, 120 S.Ct. 1595, 1603, 146 L.Ed.2d 542 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893, 103 S.Ct. 3383, 3394, 77 L.Ed.2d 1090 (1983); *United States v. Hall*, 455 F.3d at 513; *United States v. Webster*, 392 F.3d at 791; *United States v. Jones*, 287 F.3d 325, 329 (5th Cir. 2002), *cert. denied*, 537 U.S. 1018 (2002). To make such a showing, the movant need *not* show that he will prevail on the merits but, rather, must demonstrate reasonable jurists could debate whether (or, for that matter, agree) the motion should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further. *Tennard v. Dretke*, 542 U.S. at 282, 124 S.Ct. at 2569; *Miller-El v. Johnson*, 537 U.S. at 336, 123 S.Ct. at 1039; *Slack v. McDaniel*, 529 U.S. at 484, 120 S.Ct. at 1604; *Barefoot v. Estelle*, 463 U.S. at 893 n.4, 103 S.Ct. at 3394 n.4; *United States v. Webster*, 392 F.3d at 791; *United States v. Jones*, 287 F.3d at 329.

The showing necessary to obtain a CoA on a particular claim is dependent upon the manner in which the District Court has disposed of a claim. If this Court rejects a prisoner's constitutional claim on the merits, the petitioner must demonstrate that reasonable jurists could find the court's assessment of the constitutional claim to be debatable or wrong. "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El v. Johnson*, 537 U.S. at 338, 123 S.Ct. at 1040 (*quoting Slack v. McDaniel*, 529 U.S. at 484, 120 S.Ct. at 1604). "In a case in which the movant wishes to challenge on appeal this Court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default or limitations, the movant must show jurists of reason would find it debatable whether the motion states a valid claim of the denial of a constitutional right *and* whether this Court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. at 484, 120 S.Ct. at 1604 (holding, when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a CoA may issue only when the petitioner shows that reasonable jurists would find it debatable whether (1) the claim is a valid

asserction of the denial of a constitutional right and (2) the district court's procedural ruling was correct).

Viewed in proper context, there is no basis for disagreement among jurists of reason with regard to this Court's disposition of any of movant's claims herein. Movant's *Giglio-Napue* claims suffer from multiple fundamental defects: they do not identify with specificity any factually inaccurate testimony given by either Ruben Carrasco-Valdez or Rosie Soles and do not allege any specific facts showing the government knowingly utilized any factually inaccurate or false testimony to secure movants' convictions. With the exception of their complaint about their trial counsels' failure to object to movants' being sentenced on Count Three of their indictment, movants' claims of ineffective assistance by their trial counsel all fail to satisfy either prong of the *Strickland* test. For instance, movants complained generically about the brief absences from trial of their *second* interpreter, Linda Foster, but furnished this Court with no specific facts showing they were unable to communicate with their trial counsel concerning any identified subject during any of Ms. Foster's brief absences. In contrast, movants' trial counsel have furnished uncontroverted affidavits stating they never experienced any problem communicating with their clients during trial resulting from Ms. Foster's absences.

The few fact-specific allegations movants urge in support of their ineffective assistance claims are all refuted by the record. For instance, as explained in Section II.B. above, movants claim their trial counsel encouraged prosecution Rosie Soles to commit perjury. However, movants allege absolutely no specific facts showing when or how their trial counsel ever communicated with Rosie Soles other than on the record in open court. Movants' trial record utterly refutes movants' contention that their trial counsel ever did anything in open court which encouraged any prosecution witness to commit perjury. Likewise, movants' complaint that their trial counsel failed to present documents showing Gracielo Gardea was incarcerated at the time of Shorty Ocon's murder is *non sequitur*. There was no evidence suggesting Gardea played any role in Ocon's 1997 murder. On the contrary, Gardea was intimately involved in the 1998 murder of Rigoberto Loera; a fact about which there was no genuine dispute at movants' trial because Gardea and movants apparently bragged to virtually everyone they met about how they orchestrated and carried out the brutal murder of Loera and Loera's unfortunate companion Geradro Pando.

Movants' complaints that this Court coerced prosecution witnesses Soles and Carrasco-Valdez to commit perjury are also utterly refuted by the trial record. Movants' complaints about the prosecutor's allegedly inflammatory closing arguments, most

of which merely responded to defense counsels' repeated attacks on the credibility of prosecution witnesses, are not only doubly procedurally defaulted (because there was no contemporaneous objection thereto and movants did not raise this same complaint on direct appeal) but completely distort the prosecution's arguments outside of the context in which they were delivered and do not furnish even an arguable basis for Section 2255 relief. For the reasons set forth at length above, movant is not entitled to a Certificate of Appealability from this Court.

Accordingly, it is hereby **ORDERED** that:

1. Movants' request for an evidentiary hearing is **DENIED.**

2. Movants' consolidated motion to vacate, set aside, or correct their sentences pursuant to Section 2255 of Title 28, United States Code, is **GRANTED** IN PART as follows: each movant's conviction and sentence on Count Three of the Indictment against him is, in all respects, **VACATED** and **SET ASIDE;** all other relief requested in movant's original and amended consolidated motion to vacate, *i.e., docket entry nos. 1143, 1144, 1151, 1152*, as supplemented by movant's subsequent pleadings herein, *i.e., docket entry nos. 1158, 1169, 1182*, is **DENIED.**

3. The Clerk shall prepare and enter an Amended Judgment in each movant's criminal case reflecting the vacation of movant's conviction and sentence under Count Three.

4.    All other pending motions are **DISMISSED** as MOOT.

5.    Each movant is **DENIED** a Certificate of Appealability.

6.    The Clerk shall also prepare and enter a separate Judgment granting in part and denying in part movants' respective Section 2255 motions in conformity with this Memorandum Opinion and Order.

**SIGNED AND ENTERED this 20ᵗʰ day of May, 2009, at San Antonio, Texas.**

_____

**ROYAL FURGESON**
**United States District Judge**